RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

WHITNEY HODGES, as personal representative of the estate of Honestie Hodges,

*Plaintiff-Appellee*,

*v.*

CITY OF GRAND RAPIDS et al.,

*Defendants*,

SPENCER SELLNER, ANTHONY BARBERINO, and JEFFREY DIONNE, Officers, in their individual and official capacities,

*Defendants-Appellants*.

⎤
⎟
⎟
⎟
⎟
⎟
⎟
⎟
⎬ No. 24-1615
⎟
⎟
⎟
⎟
⎟
⎟
⎟
⎦

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-01230—Hala Y. Jarbou, District Judge.

Decided and Filed: May 30, 2025

Before: SUHRHEINRICH, MOORE, and NALBANDIAN, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:** Elizabeth J. Fossel, Sarah J. Hartman, Megan Luptowski, CITY OF GRAND RAPIDS, Grand Rapids, Michigan, for Appellants. Stephen R. Drew, Adam C. Sturdivant, DREW COOPER & ANDING, Grand Rapids, Michigan, for Appellee.

——————————

**OPINION**

——————————

KAREN NELSON MOORE, Circuit Judge.   In this suit under 42 U.S.C. § 1983, defendant police officers appeal from the district court's partial denial of their motion to dismiss on qualified-immunity grounds.   Because the complaint adequately states a claim for relief we **AFFIRM** the district court's order, and, to the extent the officers ask us to resolve disputed issues of fact, we **DISMISS** their appeal for lack of jurisdiction.

## I. BACKGROUND

In this suit under 42 U.S.C. § 1983, plaintiff-appellee Whitney Hodges ("Hodges" or "Whitney") represents the estate of her late daughter, Honestie Hodges ("Honestie").[1]  Hodges alleges that on December 6, 2017, she watched then eleven-year-old Honestie "walk[] out of her back door with an adult family friend, Aisha Rose, to go to a neighborhood store" when Grand Rapids Police Department ("GRPD") officers "abruptly and unexpectedly advanced on Honestie with guns drawn." R. 1 (Compl. ¶¶ 47, 49, 50) (Page ID #7).  "[T]here were at least three to four squad cars present with several officers surrounding the Hodges' home." *Id.* ¶ 69 (Page ID #9). Defendant Spencer Sellner, with his gun drawn, "yelled commands at Honestie to approach him by walking backward with her hands raised," despite Whitney's and Aisha's[2] protestations.  *Id.* ¶¶ 52, 54–56 (Page ID #7–8).  Honestie complied, at which point defendant Anthony Barberino "commanded Honestie to put her right hand behind her back," which she did. *Id.* ¶¶ 57–59 (Page ID #8).  "Defendant Barbarino [sic] pulled out his handcuffs and handcuffed Honestie's hands behind her back" as she "crie[d] and scream[ed]" in "fear, panic, and distress."  *Id.* ¶¶ 60–62 (Page ID #8).  Barberino walked Honestie toward defendant Jeffrey Dionne while officer Jake Bloom (who is not a party to this case) handcuffed Aisha, although Aisha "informed the officers that [neither] she, nor anyone at the Hodges residence, had done anything wrong."  *Id.* ¶¶ 40, 63,

———————————

[1]Tragically, Honestie died at the age of fourteen in 2020 due to complications from COVID-19.  R. 1 (Compl. ¶ 12) (Page ID #3).

[2]The complaint uses the spellings "Aisha Rose" and "Aisha Rosa" interchangeably.  For clarity, we use Aisha's first name.

65 (Page ID #6, 8). Honestie, still handcuffed, was "put in the custody" of defendant Dionne, who walked her to a nearby police car and searched her for weapons as she cried but continued to comply with Dionne's commands and answer his questions. *Id.* ¶¶ 70–72, 74 (Page ID #9). At the instruction of Sergeant Thomas Bush (also not a party), Dionne removed Honestie's handcuffs and left her sitting in the police car with the door closed as she continued to cry. *Id.* ¶¶ 39, 75–77 (Page ID #6, 9).

The complaint alleges that "GRPD was looking for an adult Caucasian woman who had allegedly stabbed another individual at a different location," and had been "described as wearing her hair in a ponytail bun and wearing a black coat." *Id.* ¶¶ 78–79 (Page ID #9). Honestie was "African American and was an 11-year-old child at the time of the incident," whose "hair was not in a ponytail bun" and who "did not match the description of GRPD's suspect." *Id.* ¶¶ 80–82 (Page ID #9). "Neither Honestie, [Aisha], nor Whitney Hodges made any movements to signal that they were fleeing the police, attempting to evade the officers on the scene, or were an immediate threat to anyone." *Id.* ¶ 67 (Page ID #8). "Honestie was not armed, believed to be armed, nor did she pose any immediate threat or danger to anyone," and she "did not make any movements that caused a threat to any of the GRPD officers on scene." *Id.* ¶¶ 122–23 (Page ID #15). "The officer[s] eventually cleared the house and the scene. The suspect they were looking for was not at that location." *Id.* ¶ 84 (Page ID #10).

Hodges alleges that by "seiz[ing] and detain[ing] Honestie at gunpoint . . . with the use of handcuffs, and by placing her in a police car, in the absence of probable cause or reasonable suspicion that she had committed any crime," Sellner, Barberino, and Dionne "violated Honestie's clearly established right to be free from unreasonable searches and seizures." *Id.* ¶¶ 114–15 (Page ID #14). According to the complaint, when Sellner pointed his gun at Honestie and when Barberino handcuffed her, they used excessive force. *Id.* ¶¶ 132–46 (Page ID #16–17). The complaint also alleges that when, after Barberino handcuffed Honestie, Dionne put her in the police cruiser, Dionne and Barberino falsely imprisoned her, *id.* ¶¶ 118–26 (Page ID #15), all in violation of Honestie's Fourth Amendment rights, *id.*; *id.* ¶¶ 132–46 (Page ID #15–17).

## II.  ANALYSIS

### A.  Standard of Review

We review de novo a district court's denial of a motion to dismiss on qualified-immunity grounds.  *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020).[3]  A district court should grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso*, 971 F.3d at 605.  A complaint states a claim when it alleges facts that, if true, make out a claim for relief that is plausible on its face, and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Thus, when evaluating a complaint's sufficiency, we accept its factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and only then determine whether those facts and inferences plausibly give rise to an entitlement to relief."  *Marvaso*, 971 F.3d at 605.  This is so even where a defendant raises the defense of qualified immunity.  *Id.*

Qualified immunity protects public officials from suit unless "(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"  *Id.* at 741(alterations in *al-Kidd*) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  The plaintiff ultimately bears the burden to show that the defendant public official is not entitled to qualified immunity, *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019), but on a motion to dismiss, the question

---

[3]The district court here also partially granted the officers' motion by dismissing the complaint's municipal-liability and substantive-due-process counts, as well as the counts brought under the Michigan constitution and Michigan state law.  *Hodges v. City of Grand Rapids*, No. 1:23-cv-1230, 2024 WL 3040882, at *8–15 (W.D. Mich. June 18, 2024).  Only Hodges's Fourth Amendment claims against the individual officers remain.  *Id.* at *14.

for the court is whether the plaintiff has plausibly alleged that the defendant violated a clearly established constitutional right. *Marvaso*, 971 F.3d at 605.

Because qualified immunity is a defense to suit rather than liability, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Guertin*, 912 F.3d at 917 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We have said, however, that this "point is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)).

The initial motion-to-dismiss question—whether a complaint pleads facts that, when presumed true, give rise to a plausible inference that the defendants violated a constitutional right—is fairly straightforward. And at summary judgment and trial the defendants will have an opportunity to demonstrate that the facts are not as the plaintiff pleaded them. But "analyzing the *second* prong of qualified immunity—whether the alleged constitutional violation is clearly established—'is sometimes difficult' on the pleadings, since that 'inquiry may turn on case-specific details that must be fleshed out in discovery.'" *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022) (quoting *Crawford v. Tilley*, 15 F.4th 752, 765 (6th Cir. 2021)). "'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin*, 912 F.3d at 917 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).

Indeed, "the application of qualified immunity today can turn on minute factual distinctions," *Crawford*, 15 F.4th at 765, particularly in light of Supreme Court precedent holding that, "in performing Fourth Amendment qualified immunity analysis, we must confine ourselves to 'the situation [the officer] confronted,' [and] carefully consider[] the 'particular factual context[]' at issue." *Hart v. Hillsdale County*, 973 F.3d 627, 642 (6th Cir. 2020) (first and fourth alterations in *Hart*) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). "That is hard to accomplish at the motion to dismiss stage." *Id.* "Oftentimes, we need a fuller factual picture to define the contours of the right at issue to determine if it was clearly

established." *Diei v. Boyd*, 116 F.4th 637, 650 (6th Cir. 2024). Qualified immunity is, however, resolvable at the motion-to-dismiss stage "when the *complaint* establishes the defense." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020). It is therefore crucial that we define the proper scope of the record on which we review the district court's denial of the defendants' motion to dismiss—the breadth of that record also guides the clearly established analysis.

As we will explain, the complaint here does not establish the defense of qualified immunity because Hodges has alleged facts making plausible the inference that the officers violated Honestie's clearly established Fourth Amendment rights to be free from unreasonable search and seizure, false imprisonment or arrest, and excessive force.

## B. Scope of the Record

The officers seek to avoid this conclusion by imploring us to consider substantial evidence outside the complaint, which they say tells a more complete story of the events of December 6, 2017 and demonstrates why they did not violate Honestie's clearly established rights. *See* Appellants Br. at 12–14, 27–32; Reply Br. at 3. Although at the pleading stage we are generally limited to the facts alleged in the complaint (which we must construe in favor the plaintiff), *Blackwell v. Nocerini*, 123 F.4th 479, 486 (6th Cir. 2024), the officers argue that we may (and indeed must) consider (1) video of the incident from officers' body-worn cameras because it contradicts the complaint's allegations (and omissions) and, (2) police reports summarizing the incident because they are public records that merely fill in the contours of the complaint. *See* Appellants Br. at 12–14. The district court ultimately declined to rely on the video and police reports for its qualified-immunity holding. *Hodges v. City of Grand Rapids*, No. 1:23-cv-1230, 2024 WL 3040882, at *3, *5 (W.D. Mich. Jun. 18, 2024). "We review the district court's treatment of materials outside the pleadings for an abuse of discretion, . . . which occurs when the district court 'relies on clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard.'" *Wershe v. City of Detroit*, 112 F.4th 357, 373 (6th Cir. 2024) (citation omitted) (quoting *United States v. Pembrook*, 609 F.3d 381, 383 (6th Cir. 2010)).

It may be true, as the officers imply, that the video and police reports tell a more complete story of what happened on the night in question, but at this stage, we do not require a complete story; we require a *plausible* one. *Marvaso*, 971 F.3d at 605. We may not consider materials outside the complaint except in narrow circumstances, and, as we shall explain, none apply here. The officers will have an opportunity to present what they view to be the complete story at summary judgment or at trial.

A few words about jurisdiction before we begin: "[a]lthough most denials of motions to dismiss are non-final orders that do not fall within Congress's statutory grant of appellate jurisdiction, . . . [p]ursuant to the collateral-order doctrine, 'a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of § 1291,'" conferring appellate jurisdiction over appeals from such an order. *Courtright v. City of Battle Creek*, 839 F.3d 513, 517 (6th Cir. 2016) (citation omitted) (quoting *Iqbal*, 556 U.S. at 672). "We have jurisdiction only to the extent that the defendant 'limit[s] his argument to questions of law premised on facts taken in the light most favorable to the plaintiff.'" *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (alteration in *Adams*) (quoting *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008)). "[W]e may overlook a factual disagreement if a defendant, despite disputing a plaintiff's version of the story, is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Id.* (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)). And "[w]e may still review 'pure question[s] of law, despite the defendants' failure to concede the plaintiff's version of the facts[.]'" *Id.* (first alteration added) (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007)).

The normal motion-to-dismiss standard mirrors the scope of our appellate jurisdiction in appeals from the denial of qualified immunity. *Id.* On a motion to dismiss, our inquiry is premised on the purely legal question of whether the facts alleged, taken in the light most favorable to the plaintiff, state a claim for relief. *See Marvaso*, 971 F.3d at 605. We are thus precluded from answering questions of fact by the final-judgment rule *and* by our law regarding motions to dismiss. We agree with Hodges that the officers have surfaced several "disputed [factual] issues that should be explored during discovery and not with this appeal," Appellee Br.

at 20, but we retain jurisdiction over the question of whether Hodges has plausibly alleged a violation of Honestie's clearly established rights, *see Adams*, 946 F.3d at 948.  As follows from our refusal discussed *infra* to consider the video and police reports, that is the only question we can or should answer at this stage.  *Id.*  We lack jurisdiction over the disputed factual issues of whether the officers in fact had reasonable suspicion or probable cause to detain or arrest Honestie, and whether the scene was in fact sufficiently dangerous to merit Honestie's detention and the force the officers used in executing it.

### 1. Body-Worn-Camera Footage

In the motion-to-dismiss context, "we have consistently held that we may only consider . . . video footage over the pleadings when 'the videos are clear and blatantly contradict[] or utterly discredit[] the plaintiff's version of events.'"  *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (alterations in *Saalim*) (quoting *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022)).  "This is because if a video clearly depicts a set of facts contrary to those alleged in the complaint, this makes a plaintiff's allegations implausible."  *Id.*  "But when the video does not blatantly contradict or utterly discredit the complaint, we do not consider it on [a] Rule 12 motion.  Instead, as when assessing any motion made under Rule 12, we rely on the allegations in the pleadings alone."  *Id.*

We must therefore determine whether the officers' proffered video evidence blatantly contradicts or utterly discredits Hodges's allegations that officers lacked probable cause or reasonable suspicion to detain or arrest Honestie and that they did so using excessive force.  Although the complaint does not reflect what, precisely, led officers to believe a stabbing suspect might have fled to Honestie's address, the parties agree that officers were indeed searching for a stabbing suspect and that Honestie did not match the suspect's description.  Appellants Br. at 4; Reply Br. at 20; R. 1 (Compl. ¶¶ 2–3, 78–82) (Page ID #2, 9).

The officers rely on our decision in *Bell v. City of Southfield* to contend that "[w]here a Plaintiff omits from her pleadings facts that are material to this Court's qualified-immunity analysis, and those facts are revealed by the video footage, the Court may treat the video as blatantly contradicting the complaint's omission."  Reply Br. at 6.  In *Bell*, we posed "a

hypothetical where there are only two facts relevant to the outcome of an appeal from the denial of qualified immunity:  first, whether the officer tased the plaintiff, and second, whether the plaintiff was holding a gun at the time."  37 F.4th at 366.  We posited that if "[t]he plaintiff's complaint only mentions the officer's tasing" and "[t]here's no mention of a gun anywhere in the complaint," but "the video footage clearly shows the plaintiff holding a gun," then "the gun's presence blatantly contradicts the complaint's omission."  *Id.*  Meanwhile, where "the video evidence is inconclusive as to what the plaintiff was holding," it does not blatantly contradict or utterly undermine the complaint's allegations, and we must "rely only on the facts in the complaint."  *Id.*  In *Bell*, we took note of the plaintiff's affirmative allegation that officers had "no need to" tase him, and held that the complaint's omission of the plaintiff's continued resistance was directly contradicted by video evidence "that he continued resisting the officers as they attempted to restrain him."  *Id.* at 367.

Even accepting *Bell*'s premise that we could permissibly use a conclusive video to fill holes in a complaint, the instant case is like the second of *Bell*'s hypotheses, where the video is inconclusive as to whether the hypothetical plaintiff was holding a gun.  The officers insist that the video here contradicts the complaint because they assert that "the video makes clear that the officers went to the Hodges's [sic] specific address because they had information that a suspect in a stabbing was at that house or might be coming to that house," Reply Br. at 4, a fact they argue that the complaint omits, *id.* at 7–8; Appellants Br. at 13–14.  But the video does not in fact show why police went to Honestie's house.  The officers cite portions of the video where officers state to Whitney and Aisha that they have information that a suspect might be at the address, but the officers do not point to a portion of the video that would reveal *what* that information was.  Appellants Br. at 28 (citing R. 14-4 (Bush Body Cam. at 9:49–10:15), R. 14-6 (Bloom Body Cam. at 12:20–12:25)); Reply Br. at 4 (same).  An officer's mere statement that they have reason to believe a crime has occurred does not, without more, establish what "particularized and objective basis" the officers *actually had* "for suspecting that criminal activity might be 'afoot' and that it might involve" Honestie's home.  Reply Br. at 13–14.  Again, the complaint already acknowledges that police were looking for the stabbing suspect; it just does not say *why*.  The video does not fill this gap.

The officers continue that "Plaintiff attempts to controvert . . . whether the scene in which the Officers' [sic] interacted with Honestie was 'dangerous.'" *Id.* at 5 (quoting Appellee Br. at 30).**[4]** The complaint contains no allegations about the safety or danger of the physical scene that could be directly contradicted by the video, even if danger were apparent from the face of the video. The officers argue that the complaint's omission of details about the dark, confined space in which the events unfolded is analogous to *Bell*'s hypothetical complaint that omits mention of the plaintiff holding a gun at the time of a tasing. *Id.* at 5–8. But, whether the scene was sufficiently dangerous to merit the officers' treatment of Honestie is a question of fact over which we lack jurisdiction. *See Adams*, 946 F.3d at 948. Consideration of the officers' briefing confirms as much: in contrast to *Bell*'s hypothetical of two facts relevant to the qualified-immunity analysis (whether the officer tased the plaintiff and whether the plaintiff was holding a gun—both simple yes or no questions), the officers argue here that we should consider two "sets of facts," one set that appears in both the complaint and video, and another that appears only in the video. Reply Br. at 7. Appellants argue that the complaint's omission of the second set of facts allows us to consider both sets, despite the fact that, together, they take up half a page of the officers' brief, and contain extensive additional factual detail regarding the information police received, the physical layout of the arrest scene, the positioning of Honestie relative to the other two women with her, as well as the physical appearances of those women. *Id.* Whereas, in *Bell*'s hypothetical, a viewer could tell from a glance at the hypothetical video whether the hypothetical plaintiff was holding a gun when he was tased, here it would require much closer interpretation and analysis to identify potential conflicts (if any) between the video's depiction of the officers' proffered facts and the complaint's purported omissions.

Even if the video showed what the officers say it does, it is not clear that the complaint's mere omission—of the information that police officers had received reports that the stabbing suspect might flee to Honestie's address or of a physical description of the scene—can meet the directly-contradicts-or-utterly-discredits threshold. The complaint's failure to explain what information led the police to Honestie's home must be read in concert with its allegations that the

---

**[4]**Of course, this assertion by the officers flips the relevant inquiry on its head; at this stage it is the officers who are (improperly) attempting to controvert the complaint, not the other way around.

police lacked "probable cause or reasonable suspicion that Honestie was committing or had committed a crime." R. 1 (Compl. ¶ 8) (Page ID #2). The complaint's key contention is that, whatever reason officers had to detain Honestie that day, it was not enough. Indeed, although *Bell* interpreted the complaint there as omitting the plaintiff's continued resistance from the complaint's allegation of excessive force, the plaintiff's allegation that officers had "no need to" tase him was also an affirmative, if implicit, allegation that the plaintiff was not resisting. 37 F.4th at 367. And in *Bell*, the video directly and obviously contradicted the plaintiff's allegation because it "clearly show[ed]" the plaintiff resisting, giving officers reason to tase him and contradicting the complaint. *Id.* But here, the video does not, at the motion-to-dismiss stage, resolve the context-specific question of whether officers had probable cause or reasonable suspicion the way a video might resolve whether a suspect had a gun in their hand or was resisting arrest.

Even if it did, acceptance of the appellants' invitation to consider the video over the complaint would threaten our jurisdiction. *See Adams*, 946 F.3d at 948. That is because a dispute about whether officers had probable cause or reasonable suspicion under the circumstances is necessarily fact bound and would require us to answer factual questions about what circumstances actually existed. *See Hart*, 973 F.3d at 642.

Similarly, details about the dark and confined nature of the scene may well be relevant to determining whether officers had cause to detain Honestie, but they are relevant to the *merits* of Hodges's claims. A dispute about whether the scene was dangerous enough to justify the detention of an eleven-year-old girl is the type of quintessential fact issue resolved by a jury or at summary judgment in qualified-immunity cases. Our law provides that the probable cause and reasonable suspicion inquiries are "confine[d] . . . to 'the situation [the officer] confronted,'" and that we must "carefully consider[] the 'particular factual context[]' at issue." *Id.* (alterations in *Hart*) (quoting *Wesby*, 583 U.S. at 64). But here, because our inquiry is (rightfully) confined to the complaint, "[t]he 'circumstances with which the officers were confronted' are unknown," which "demonstrates why this case cannot be resolved on a motion to dismiss." *Id.* at 641. To accept the officers' contention that, at the motion-to-dismiss stage, we can consider evidence of "a potential threat to the safety of the Officers (and even to Honestie) which justified all of [the

Officers'] action in this case," Reply Br. at 8, just because the complaint (naturally) presents a different perspective on the events, would be to allow the exception to swallow the rule.

In qualified-immunity cases, a plaintiff will often argue that the circumstances did not create probable cause, reasonable suspicion, or threat to an officer, and defendants will often disagree. Plaintiffs are not, as the officers' arguments imply, required to allege every fact that a court might glean from available video evidence in order to survive a motion to dismiss. So long as their allegations are not blatantly contradicted or utterly undermined by video evidence, *Saalim*, 97 F.4th at 1002, the plaintiff need only allege facts that give rise to the plausible inference that the defendants violated a clearly established right, *Courtright*, 839 F.3d at 518. The officers cannot escape this fundamental rule by arguing that the video shows a more complete picture of the events than the complaint; that is an argument for summary judgment or for trial. As discussed above, we see nothing in the video that blatantly contradicts or utterly undermines Hodges's allegation that the officers lacked probable cause or reasonable suspicion. And the officers will have an opportunity to contest that allegation on the merits using whatever admissible evidence they wish to present, just not at the motion-to-dismiss stage.

The district court initially relied on *Bell*'s statement that, "when uncontroverted video evidence easily resolves a case . . . it makes little sense to waste time and effort by ignoring the videos' contents," 37 F.4th at 364, to find erroneously that it could consider the video evidence, *Hodges*, 2024 WL 3040882, at *4. But *Bell*'s very next sentence notes that, on a motion to dismiss, "our use of the videos is limited" and that "we can only rely on the videos over the complaint to the degree the videos are clear and 'blatantly contradict[]' or 'utterly discredit[]' the plaintiff's version of events." *Bell*, 37 F.4th at 364 (alterations in *Bell*) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). This confirms that, even if available video evidence would save "time and effort" or would "easily resolve a case," we may not consider it at the motion-to-dismiss stage if it does not blatantly contradict or utterly undermine the complaint. *Id.* To the district court's credit, it acknowledged this is as well, and despite utilizing the video in its recitation of the facts, the district court found that the video footage did not blatantly contradict or utterly undermine the complaint's allegations and did not support the officers' claims of qualified immunity. *Hodges*, 2024 WL 3040882, at *5. Because we agree and ultimately affirm

the district court's denial of qualified immunity, the district court's use of the video was harmless.

### 2. Police Reports

The officers contend that the district court erred by refusing to consider two documents which they attached to their motion to dismiss. They argue on appeal that we should consider a Computer Automated Dispatch ("CAD") Event Report and an Incident Report (together, "the reports"), which purport to summarize the events that led police to Honestie's house that day, as well as the events that came after. *See* R. 14-1 (CAD Rep.) (Page ID #115); R. 14-3 (Incident Rep.) (Page ID #121). The district court declined to take the reports into account on the grounds that it was "not obligated to consider evidence that is 'subject to reasonable dispute' or that 'captures only part of the incident and would provide a distorted view of the events at issue[.]'" *Hodges*, 2024 WL 3040882, at *3 (alteration in *Hodges*) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008)).

"When a party moves to dismiss an action under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, both sides proceed with the expectation that the court will decide the motion on the basis of the pleadings alone unless the court notifies them otherwise." *Chun Ok Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993). Indeed, Rule 12(d) provides that "[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). That said, courts "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein" without converting to a summary-judgment motion. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

An animating concern behind Rule 12(d) is that, where the court considers extraneous material (even public records) on a motion to dismiss, "there is no way for an opposing party, prior to the issuance of the court's decision, to register his or her disagreement with the facts in

the document of which the court was taking notice." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). To put a finer point on it, there is no way for the opposing party to develop and present evidence to support their disagreement with the facts presented in the extra-complaint material. For this reason, and as the district court correctly noted, *Hodges*, 2024 WL 3040882, at *3, "[w]here the evidence 'captures only part of the incident and would provide a distorted view of the events at issue,' . . . we do not require a court to consider that evidence on a 12(b)(6) motion," *Jones*, 521 F.3d at 562 (citation omitted).

The officers' proffered reports illustrate the problem. The Incident Report contains over a dozen officers' narrative accounts of the events of December 6. R. 14-3 (Incident Rep. at 5–11) (Page ID #124–30). If this case were before us at the summary-judgment stage, Hodges would have had the opportunity to depose these officers about the accuracy of their statements and could dispute the version of events presented in the Incident Report. Likewise, the CAD Report contains what appear to be logs of real-time communications between dispatchers and officers. R. 14-1 (CAD Rep. at 2–5) (Page ID #115–18). At the summary-judgment stage, Hodges would have had the opportunity to develop evidence about what was happening in the background of these in-the-moment communications and whether that information was accurately relayed to the officers on the scene. But at the motion-to-dismiss stage, Hodges has had no such opportunities, and for good reason; at this stage, the factual allegations in the complaint are not in dispute—the legal sufficiency of the complaint is. When the officers argue that the reports "simply filled in the contours and details of Plaintiff's Complaint," Appellants Br. at 51, they mean that the reports fill in the details of the complaint with *the officers'* version of the facts. *See Blackwell*, 123 F.4th at 487 (holding that it would "flout[] basic pleading rules" to consider the defendant-officials' proffered extra-complaint police reports—purporting to document a threat the plaintiff reportedly made in the lead up to his allegedly illegal arrest, but which was not in the complaint—because the documents represented the officials' "own conflicting story about the investigation"). At the motion-to-dismiss stage, this is impermissible. The reports are quintessential evidence, which the officers will have an opportunity to present before the district court should they choose to move for summary judgment.

The officers nonetheless argue that the district court should have considered the reports because they are public records, *see id.*, but in doing so they rely on the definition of the term "public records" for purposes of the hearsay exception contained in Federal Rule of Evidence 803(8).  Appellants Br. at 48 & n.10 (acknowledging that "this Court has not expressly defined what can be considered a 'public record' when it comes to documents offered in support of a Motion to Dismiss" (emphasis omitted)).  The officers provide no basis for their resort to this rule and we see no reason why its definition should control.  We think it likely that our case law's use of the term "public records" is better understood to mean something closer to "matters of public record," like those of which we may take judicial notice.  5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (4th ed. 2024); *Blackwell*, 123 F.4th at 487 ("We . . . allow district courts to take judicial notice of 'public records' without converting a motion to dismiss into a summary-judgment motion." (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999))); *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) ("In addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or *are otherwise appropriate for the taking of judicial notice*." (emphasis added)).

The judicial-notice framing makes sense because it ameliorates the fairness concerns that animate Rule 12(d); ordinarily, we take judicial notice of adjudicative facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *accord In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014).  On a motion to dismiss, "[c]ourts may consider public records for the truth of the statements contained within them only when the 'contents prove facts whose accuracy cannot reasonably be questioned.'"  *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) (quoting *Passa*, 123 F. App'x at 697).  Otherwise, "[t]his exception . . . generally allows a court to conclude only that the record exists; the exception does not allow the court to treat all information in the record as true."  *Blackwell*, 123 F.4th at 487.[5]

---

[5]The officers argue that the reports are not offered for their truth, but rather for their effect on the listener— "merely to show what information the Officers had that prompted them to go to the Hodges's [sic] residence and act with caution."  Appellants Br. at 49 n.11.  But that is offering the report for truth.  The officers want the court to consider these documents because they go to the heart of a key merits issue in this case and one over which we have

A party cannot evade Rule 201's requirements by proffering a purported public record in support of its motion to dismiss, rather than in another context. In fact, for the reasons outlined above, restrictions on judicial notice of adjudicative facts may be particularly important at the motion-to-dismiss stage where the parties have not yet had an opportunity to develop their evidence. The hearsay exception in Rule 803(8) may rest on the premise that "matter[s] observed while under a legal duty to report" or "factual findings from a legally authorized investigation," Fed. R. Evid. 803(8)(A), are more reliable than other hearsay statements for purposes of trial, *see* Robert P. Mosteller, 2 McCormick on Evidence § 295 (9th ed. 2025). But the hearsay exception simply does not provide sufficient protection at the motion-to-dismiss stage. *See Passa*, 123 F. App'x at 697. At trial, the opposing party would have the opportunity to offer evidence to counter the content of a Rule 803(8) public report or to question its credibility. No such opportunity exists at this stage.

Ultimately, a district court has "discretion to reject any extra-pleading matter if the judge feels that it is not substantial or comprehensive enough to facilitate the disposition of the action." 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1364 (3d ed. 2024). Because the reports present only the appellants' version of the facts, which Hodges has not had opportunity to dispute with her own evidence, and because "the subject matter of those [reports] is the heart of the matter contested in this suit," we cannot say the district court abused its discretion in declining to consider the reports as public records on the grounds that their contents are subject to dispute. *See In re Omnicare*, 769 F.3d at 468.

The officers' next argument, that the CAD Report should be considered because it was referred to in the complaint and is central to Hodges's claims, Appellants Br. at 50–51, fails because it rests on nothing but factual overlap and linguistic similarity between the complaint and CAD Report. *See Blackwell*, 123 F.4th at 487 (affirming district court's refusal to consider

---

no jurisdiction: whether officers in fact had probable cause or reasonable suspicion to detain Honestie. And regardless, the question at this stage is whether the court may take judicial notice of the reports, not whether the reports might later be presented to a jury pursuant to an exception to the hearsay rule. The purpose for which the documents were offered is therefore inconsequential. *See Blackwell*, 123 F.4th at 487. The only thing the court can permissibly glean from the reports at this stage is that the police department documented the events of December 6 in the form of a CAD Report and Incident Report. Anything further would unfairly presuppose the reports' accuracy.

police report and criminal complaint when the plaintiff's "complaint generically refer[red] to the police investigation and prosecution" but not to the documents themselves). If, on a motion to dismiss, a district court could consider any document that described some of the same facts alleged in the complaint, Rule 12(d)'s protections would lose their meaning.

In this context, a document is central to a complaint when the legal sufficiency of the complaint depends on the content of the document. *Id.* ("As the classic example, a plaintiff who asserts a breach-of-contract claim cannot prohibit a district court from considering the whole contract (including the contract terms that undermine the claimed breach) merely by omitting the contract from the complaint."). Here, Hodges's "claim[s'] . . . validity [does not] rise[] or fall[] with" the contents of the reports. *Id.* "If anything, it is more accurate to say that the [reports] are central to the [officers'] *defense*." *Id.*

Also doomed is the officers' argument that the reports were properly before the district court because they merely "filled in the contours and details of Plaintiff's Complaint," a proposition for which the officers cite unsupported dicta. Appellants Br. at 46, 51–52.[6] In asking the court to consider the fact-laden reports, the officers "ask us to disregard the normal 'presumption of truth' that we must give to a complaint's well-pleaded facts based on their own conflicting story about the investigation." *Blackwell*, 123 F.4th at 487 (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 442 (6th Cir. 2012)). The officers will have an opportunity to tell their side of the story by filling in the contours of Hodges's allegations at summary judgment or at trial, but for now, she is the master of her complaint. *Cf. Rogers v. Webstaurant Store, Inc.*, 774 F. App'x 278, 282 (6th Cir. 2019) ("Most importantly, the plaintiff decides what factual allegations go into her complaint.").

---

[6]*Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997), does not bind us for two reasons: first, *Yeary*'s holding did not rely on the comment in dicta that the extra-complaint material in question "simply filled in the contours and details of the plaintiff's complaint, and added nothing new." *Id.* at 445. Instead, the court held that the district court's rationale did not in fact hinge on the additional information provided by the extraneous documents and so there was no reversible error. *Id.* Second, the officers' assertion that, like in *Yeary*, the reports add nothing new to the complaint, is obviously wrong—the reports contain many of the same details that are portrayed in the video and which, in that context, the officers argue blatantly contradict and utterly undermine Hodges's complaint. The same information cannot add "nothing new" to the complaint while simultaneously contradicting it.

Finally, the officers cite nonbinding out-of-circuit law for the proposition that the court should consider the reports because Hodges had "actual notice of the documents and relied on them in framing her Complaint." Appellants Br. at 47. Even assuming both of those assertions were true (which we do not decide), the officers' proposed exception to Rule 12(d) is unsupported. For their argument, the officers rely exclusively on a Second Circuit case where the court wrote in what is arguably dicta that, although the district court had not in fact considered the extra-complaint materials and therefore (contrary to the plaintiff-appellants' assertion) did not err by doing so, the district court *could have* considered the materials had it so chosen. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

The district court did not err by declining to consider the CAD and Incident Reports. The officers' exhortation that we should consider the video evidence and reports is a naked attempt to introduce improper substantive evidence at the motion-to-dismiss stage and in contravention of our proper appellate jurisdiction. The officers have not shown that any exception to Rule 12(d) applies so as to permit this end-run around the law governing motions to dismiss and final judgments.

## C.  Qualified Immunity

Having determined the proper scope of the record on appeal, we must now determine whether Hodges has plausibly alleged that the officers violated Honestie's clearly established rights. *Marvaso*, 971 F.3d at 605. For the reasons discussed above, we may do so based only on the complaint's allegations, and not the information presented in the video or the reports. Hodges alleges that the officers violated Honestie's Fourth Amendment rights by unreasonably seizing and searching her when they held her at gunpoint, handcuffed her, and put her in the police cruiser, R. 1 (Compl. ¶¶ 114–15) (Page ID #14), by falsely imprisoning Honestie when they handcuffed her and put her in the back of the police cruiser, *id.* ¶¶ 118–26 (Page ID #15), and by subjecting her to excessive force when they detained her at gunpoint and handcuffed her, *id.* ¶¶ 132–45 (Page ID #16–17).

**1. Unreasonable Search and Seizure**

No one disputes that the officers detained or seized Honestie without her consent. *See* Appellants Br. at 26. Hodges alleges that all three officers took part in the seizure: Sellner by detaining Honestie at gunpoint, R. 1 (Compl. ¶¶ 51–52, 56) (Page ID #7–8), Barberino by handcuffing her, *id.* ¶¶ 58–60, 63 (Page ID #8), and Dionne by putting her in the police cruiser, *id.* ¶¶ 71, 76 (Page ID #9). At the very least, officers must have reasonable suspicion for such an investigative (*Terry*) stop, and, if the stop evolves into an arrest, officers must have probable cause. *Bey v. Falk*, 946 F.3d 304, 312–13 (6th Cir. 2019). We begin with reasonable suspicion because if officers lack reasonable suspicion, they necessarily lack probable cause. *See id.* "[R]easonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 313 (alteration in *Bey*) (quoting *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011)).

The complaint alleges that Honestie did not match the description of the suspect the officers were pursuing and that, at the time of the seizure, Honestie did not make "any movements to signal that [she] w[as] fleeing the police, attempting to evade the officers on the scene," she "was not armed, believed to be armed, . . . [did not] pose any immediate threat or danger to anyone," and she "did not make any movements that caused a threat to any of the GRPD officers on scene." R. 1 (Compl. ¶¶ 67, 78–82, 122–23) (Page ID #8–9, 15). These factual allegations go beyond bare legal conclusions and make plausible the complaint's allegation that the officers lacked a "particularized and objective basis for suspecting" Honestie of criminal activity. *Bey*, 946 F.3d at 313 (quotation omitted). If proven at trial, such facts support "the reasonable inference that the defendant[s]" lacked reasonable suspicion and violated Honestie's Fourth-Amendment rights. *Iqbal*, 556 U.S. at 678.**[7]**

---

**[7]**The complaint does not support the officers' argument that they acted reasonably to secure a dangerous and unpredictable scene. *See* R. 1 (Compl. ¶ 67) (Page ID #8) ("Neither Honestie, [Aisha], nor Whitney Hodges made any movements to signal that they were fleeing the police, attempting to evade the officers on the scene, or were an immediate threat to anyone."). The officers may introduce factual evidence in support of their argument that the scene was dangerous at the summary-judgment stage and at trial. For this reason (among others), the officers' citation to *Wyatt v. Blair*, Appellants Br. at 22–25, is inapposite given that there, unlike here, evidence of the potential danger confronting officers was properly before the state court when it conducted a summary-

Our case law underscores that, absent reason to believe a detainee has committed a crime (for example, when the detainee matches a suspect's description), and absent a threat to others on the scene or an indication that a prospective detainee intends to flee or assault officers, there is no reasonable suspicion for even a temporary stop. *See United States v. Noble*, 762 F.3d 509, 523 (6th Cir. 2014) (holding no reasonable suspicion existed where there was no evidence that detainee "gave [officers] any reason to suspect that he was inclined to assault the officers, . . . had anything in his hands[,] . . . indicated that he had a weapon, or . . . behaved in a threatening manner"); *United States v. Jackson*, 188 F. App'x 403, 409 (6th Cir. 2006) (holding that no reasonable suspicion for stop existed where officers "stopped a car that was a different make and model from that being sought, traveling in the wrong direction, and that was driven by an individual who did not match the physical description of the suspect"). This case law demonstrates that the complaint here adequately alleges a plausible violation of Honestie's clearly established right to be free from detention absent at least reasonable suspicion.

### 2. False Imprisonment or Arrest

An officer commits false arrest or imprisonment in violation of the Fourth Amendment when they "effect[] a warrantless arrest without probable cause." *Akima v. Peca*, 85 F.4th 416, 422–23 (6th Cir. 2023). "Probable cause exists if a person of 'reasonable caution,' considering 'the facts and circumstances within' the officer's knowledge, would 'believe that an offense had been, was being, or was about to be committed.'" *Id.* (quoting *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019)). As discussed above, the complaint plausibly alleges that Barberino and Dionne had no reason to believe that Honestie was dangerous, would flee, or was involved in the commission of a crime, given that she did not match the stabbing suspect's description. The complaint thus adequately pleads that officers had neither probable cause nor reasonable suspicion to arrest Honestie. The complaint also states facts giving rise to the plausible inference that Honestie was indeed arrested.

---

judgment-like analysis to determine whether a genuine issue of material fact existed, *Wyatt v. Blair*, No. 259750, 2006 WL 2135761, at *2 (Mich. Ct. App. Aug. 1, 2006). Similarly unavailing is the officers' argument that they were conducting something akin to a reasonable protective sweep of the scene because Whitney, rather than Honestie, matched the description of the stabbing suspect. *See* Appellants Br. at 30–31. The complaint contains no allegations about Whitney's physical appearance and whether she matched the description of the suspect.

An investigative stop of the kind the officers concededly effected on Honestie "may . . . ripen into an arrest through the passage of time or the use of force." *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814 (6th Cir. 1999). "Although there is no bright line that distinguishes an investigative stop from a *de facto* arrest, . . . the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion." *Id.* (citations omitted). Commentators have written that "a seizure is an arrest rather than a *Terry* detention if 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" 3 Wayne R. LaFave, Search and Seizure § 5.1(a) (6th ed. 2024) (quoting *United States v. Corral-Franco*, 848 F.2d 536, 540 (5th Cir. 1988)). We have held that neither "the use of handcuffs" nor "detention in a police cruiser . . . automatically transform a[n] [investigative] stop into an arrest" "so long as the circumstances warrant th[ose] precaution[s]." *Houston*, 174 F.3d at 815. The complaint must therefore plausibly allege that the detention of Honestie was "qualitatively and quantitatively . . . so intrusive with respect to [Honestie]'s freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994) (quoting *Hayes v. Florida*, 470 U.S. 811, 815–16 (1985)).

Although it is a closer question than the existence of probable cause, we hold that the complaint alleges facts giving rise to the plausible inference that the manner in which Barberino and Dionne detained Honestie—by handcuffing her and putting her in the police car, respectively—was so disproportionate to their reasons for detaining her that, for Fourth Amendment purposes, it transformed her detention into an arrest. This conclusion is necessarily informed by the fact that, accepting the complaint's allegations as true, officers had neither reasonable suspicion nor probable cause to detain Honestie. *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 876 (6th Cir. 2012) ("A broader factual base of suspicion permits a broader scope of detention because . . . '[t]he scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop.'" (quoting *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994))). A reasonable person in Honestie's

position, as an eleven-year-old child detained at gunpoint,**8** handcuffed, and put in the back of a police cruiser, could reasonably "underst[and] the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."  LaFave, 3 Search and Seizure § 5.1(a) (quoting *Corral-Franco*, 848 F.2d at 540).

"It is beyond doubt that," at the time of Honestie's alleged arrest, "'the law was clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual.'"  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005) (quoting *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)).  As discussed above, the complaint plausibly alleges that Barberino and Dionne did just that.  At the motion-to-dismiss phase, this is sufficient to avoid dismissal on qualified-immunity grounds.  *See Evans-Marshall*, 428 F.3d at 234–35 (Sutton, J., concurring) ("Individual defendants . . . will only rarely be able to establish that the right was not 'clearly established' at this stage of the dispute. . . . Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely govern[ed]' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not."); *accord Hart*, 973 F.3d at 642.

### 3. Excessive Force

In determining whether an officer used excessive force in violation of the Fourth Amendment, "[t]he bottom-line inquiry is 'whether the totality of the circumstances justifies a particular level of force.'"  *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019)).  Three factors guide this inquiry:  "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006)).  We ask "whether the officers' actions [were] objectively reasonable in light of the facts and

---

**8**Although the complaint does not allege specifically that Honestie's detention at gunpoint (prior to the handcuffing) constituted false arrest, it is certainly one of the circumstances a court would consider in assessing whether the investigative stop ripened into an arrest. *See* 3 LaFave, Search and Seizure § 5.1(a); *Houston*, 174 F.3d at 814–15.

circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam).

Historically, this Circuit's precedent required the court to "segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Id.* We would "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)); *id.* at 1162 (limiting the scope of inquiry to "the moments preceding the [police] shooting" and excluding all prior events). But the Supreme Court's recent holding in *Barnes v. Felix*, 605 U.S. ___ (2025) makes clear that such a segmented approach inappropriately "constricts the proper inquiry into the 'totality of the circumstances.'" Slip Op. at 4.

In *Barnes*, the defendant officer pulled a driver over for a traffic stop. *Id.* at 2. When, in the midst of the stop, the car began to pull away with the driver's door open, the officer jumped onto the door sill and in a matter of seconds fired two shots into the car, killing the driver. *Id.* The lower courts had been bound by Fifth Circuit precedent to consider the officer's reasonableness only in light of the situation existing at the moment of the threat. *Id.* at 3. The lower courts determined that the moment of the threat was confined to the two seconds between when the officer jumped on the door sill and when he fired his first shot, and that it did not include the circumstances of the preceding traffic stop. *Id.* at 3.

The Supreme Court held that this moment-of-threat approach was erroneous because "the 'totality of the circumstances' inquiry into a use of force has no time limit." *Id.* at 5. Acknowledging that "the situation at the precise time of the shooting will often be what matters most," the Court wrote that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* Events immediately preceding a use of force "cannot be hermetically sealed off from the context in which they arose." *Id.* at 5–6 (quoting Brief for the United States as Amicus Curiae at 14). "[N]o rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-

dependent and context-sensitive approach [the Court] ha[s] prescribed." *Id.* at 7 ("A court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders.").

With the Supreme Court's guidance in mind, we must consider whether Hodges has plausibly alleged that, under the totality of the circumstances—including all of the events preceding Honestie's detention—the officers used excessive force. *Hart*, 973 F.3d at 639–42. Hodges alleges that the defendants used excessive force on Honestie, Sellner by "drawing and pointing . . . [a] [gun] directly towards an unarmed child," R. 1 (Compl. ¶ 137, 146) (Page ID #16–17), and Barberino by handcuffing her, *id.* ¶ 138, 146 (Page ID #16–17). We are again limited to the facts asserted in the complaint in applying the above-recited factors to this allegation.

Where the seriousness of the crime is concerned, the complaint's allegations state only that "GRPD was looking for an adult Caucasian woman who had allegedly stabbed another individual at a different location." *Id.* ¶ 78 (Page ID #9). This is far from an allegation that the stabbing actually happened, but we assume the crime at issue was a stabbing—a serious and violent crime. Although this first prong weighs in favor of the officers' use of force, the remaining two prongs do not. The complaint expressly avers that Honestie posed no threat to officers or anyone else and showed no signs of resisting or attempting to evade arrest. *Id.* ¶¶ 141, 143 (Page ID #17). Nonetheless, the complaint alleges, the officers used force on Honestie by holding her at gunpoint and handcuffing her. *Id.* ¶¶ 137–46 (Page ID #16–17). This allegation gives rise to the plausible inference that each defendant acted in a manner objectively unreasonable under the circumstances.

It is clearly established that holding a detainee at gunpoint and in handcuffs constitutes the use of force.[9] *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019). "We have recognized

---

[9]The allegations in this case, which aver that the officers unreasonably used a gun and handcuffs to execute an unlawful arrest, distinguish it from our excessive-force precedents regarding the use of handcuffs alone to effect a lawful arrest. *See Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001) ("[T]he handcuffing of a person *in the course of an otherwise lawful arrest* fails, as a matter of law, to state a claim for excessive force." (emphasis added)); *see also Binay v. Bettendorf*, 601 F.3d 640, 648–50 (6th Cir. 2010) (holding officers were not entitled to qualified immunity on claims that they used excessive force by unnecessarily holding the plaintiffs at gunpoint and in handcuffs, despite having done so while executing a lawful search warrant).

that 'pointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply with the [] demands, the [one pointing the firearm] will shoot the individual.'" *Id.* (alterations in *Vanderhoef*) (quoting *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007)). And it is clearly established that the same conduct can constitute excessive force in violation of the Fourth Amendment if it is objectively unreasonable under the circumstances. *Binay v. Bettendorf*, 601 F.3d 640, 649–50 (6th Cir. 2010) (holding that plaintiffs alleged sufficient facts to show excessive force where the plaintiffs, who were held at gunpoint and handcuffed, "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee"); *see also Vanderhoef*, 938 F.3d at 277–78.

"[T]he fact that it is *sometimes* reasonable to use handcuffs and guns when detaining suspects does not support Defendants' argument that the amount of force used *in this case* was objectively reasonable. Whether an exercise of force is excessive will vary depending on the facts and circumstances of the specific case." *Binay*, 601 F.3d at 649–50. Defendants will have an opportunity to explain to the district court or a jury why the facts and circumstances justified their use of force, but Hodges has plausibly alleged that Sellner and Barberino each violated Honestie's clearly established right to be free from excessive force.

**\*\*\*\***

The officers concede that "the totality of the *all* the circumstances, including the information that the officers had before they interacted with Honestie, is critical to determining whether they should have known that their actions violated a clearly established right." Reply Br. at 13. We agree, which is why this case should be resolved after the parties have exchanged discovery.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order finding that Hodges plausibly alleged that the officers violated Honestie's clearly established rights. To the extent the officers ask us to resolve disputed factual issues about whether the officers in fact had

reasonable suspicion or probable cause to detain Honestie or whether their use of force was in fact reasonable under the circumstances, we **DISMISS** their appeal for lack of jurisdiction.