RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAYNA LEE, Administratrix of the Estate of Randy
Thomas Groom, deceased,

*Plaintiff-Appellant,*

*v.*

DAVID SHANE RUSS,

*Defendant-Appellee.*

┐
│
│
│
│
│  No. 21-5919
│
│
│
│
┘

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Columbia.
No. 1:19-cv-00052—William Lynn Campbell, Jr., District Judge.

Argued: April 27, 2022

Decided and Filed: May 6, 2022

Before: SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Benjamin K. Raybin, RAYBIN & WEISSMAN, P.C., Nashville, Tennessee, for
Appellant. Robert M. Burns, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellee.
**ON BRIEF:** Benjamin K. Raybin, David J. Weissman, RAYBIN & WEISSMAN, P.C.,
Nashville, Tennessee, for Appellant. Robert M. Burns, Samantha A. Burnett, HOWELL &
FISHER, PLLC, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge. Captain David Russ shot and killed Randy Thomas Groom
during a confrontation after Groom stole a prescription from a pharmacy. Groom's estate sued

Russ for using excessive force.  The district court granted Russ qualified immunity.  It reasoned that, although a reasonable jury could conclude that Groom did not pose a serious threat at the time of the shooting, precedent did not clearly establish the unlawfulness of Russ's conduct.  We reverse.

I.

Considerable misfortune occurred in Lawrenceburg, Tennessee, on June 29, 2018. Randy Groom entered a Rite Aid pharmacy to refill a prescription for a brand-name drug that treats opioid addiction.  He carried a large knife in a sheath.  At the outset, a technician informed Groom that he could not use a coupon with which he hoped to buy the drug.  Undeterred, Groom paced the store for a few minutes while he waited for the prescription.  When the pharmacist called Groom to the counter to check him out, Groom grabbed the prescription and left the store without paying.  The pharmacist followed him out, offering to provide a lower-cost drug in an amount Groom could afford.  Groom refused the offer and kept walking.

Shortly after 5 p.m., the Lawrenceburg emergency dispatcher alerted the City's police officers that a man carrying a large knife had robbed a local Rite Aid.  The dispatcher added that the suspect, Randy Groom, left the pharmacy and ran toward a nearby Tractor Supply store. Captain David Russ and Officer Jason Lee responded to the area.  Russ had some familiarity with Groom, a Lawrenceburg resident known for walking around the city because he did not own a car.  Russ also had heard that Groom suffered from mental illness and had attempted suicide before.

The officers spotted Groom as he walked along an access road in a shopping center parking lot.  Russ parked his vehicle at the northern entrance to the road and got out of the car. Officer Lee pulled up at the road's south end and exited his car at the same time.  Russ announced himself and told Groom that they needed to talk.  Groom reached for his waistband, lifted his shirt, and pulled a large knife out of a sheath in his shorts.  "Not today David," he said. R.69 at 22.  Both officers drew their firearms.

Groom ignored several commands from the officers to drop the knife and started walking toward Russ, who stood next to his vehicle.  Officer Lee approached Groom from behind.

Groom waved his knife around as he walked. He came to a stop 30 feet from Russ. He told Russ to shoot him, repeating himself at least five times. Officer Lee testified that, although Groom at first was "being very belligerent" and "yelling," R.70-2 at 3, he appeared to deescalate the situation because he stopped walking and eventually stopped waving the knife, instead holding it at waist height.

This status quo held for another 20 seconds. But it did not last. Holding the knife near his waist, Groom took another step. Russ claims that Groom stepped toward him. Groom's estate claims that he stepped sideways. What no one disputes is that Russ, still standing near the rear of his vehicle, fired a shot at Groom. It struck Groom in the chest. He collapsed and died from the wound.

Dayna Lee, the mother of Groom's minor daughter, filed this 42 U.S.C. § 1983 action against Russ, alleging that he used excessive force in violation of the Fourth and Fourteenth Amendments. Russ moved for summary judgment based on qualified immunity. The district court granted the motion.

## II.

Familiar principles govern this appeal. Qualified immunity protects Russ unless (1) he violated Groom's constitutional rights and (2) those rights were clearly established at the time. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). An officer violates the Fourth Amendment if he uses excessive force to seize a suspect. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). The use of lethal force is excessive unless an officer has probable cause to believe a suspect poses an immediate threat of serious physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Given the multitude of settings in which an officer might use force, we must define with specificity the legal rule that the officer allegedly violated. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). In an "obvious case," it is true, general principles suffice. *Id.* More commonly, a plaintiff must identify another case that places the constitutional question beyond debate. *Id.* The facts "need not be identical, but they must be similar enough that the

other case squarely governs this one." *Studdard v. Shelby County*, 934 F.3d 478, 481 (6th Cir. 2019) (quotation omitted).

Put through these paces, Russ's bid for qualified immunity falters.

In the first place, construing the record evidence in the estate's favor as we must at this stage, a reasonable jury could find that Russ violated Groom's constitutional rights. Groom did not pose an imminent and serious risk when Russ fired his weapon. Russ, the closest individual, stood near the back of his vehicle 30 feet away. Officer Lee provided cover with his firearm from behind Groom. Aside from telling Russ "[n]ot today" when Russ said they needed to talk, R.69 at 22, Groom did not make any verbal threats. He stood still for roughly 20 seconds, lowered his knife to waist height, then made one step sideways to Russ. This was not a threatening advance or at least that is what a jury could find on this record. Even so, Russ fired the shot as soon as Groom "began to move." R.56-8 at 4. Granted, Russ knew that Groom had robbed a pharmacy. He knew that Groom had unsheathed a knife when the officers confronted him and disregarded commands to drop it. And he knew that Groom had walked to a position 30 feet away and that Groom told Russ to shoot him. But all record facts considered, Groom's actions in the moments before the shooting did not justify lethal force. Even Officer Lee thought that Groom had calmed down and "didn't see any reason for a shot to be fired from where" he stood behind Groom. R.70-2 at 6. On this record, a reasonable jury could find that Russ used excessive force.

In the second place, this right was clearly established in this context. In *Sova v. City of Mount Pleasant*, 142 F.3d 898 (6th Cir. 1998), Thomas Sova, apparently suicidal, was cutting himself with butcher knives in his parents' kitchen. His parents called 911. When police arrived on the porch, Sova yelled at them to leave. He also told the police that he wanted them to shoot him. When Sova started moving toward the kitchen door leading to the porch where the officers stood, the officers ordered him to drop the knives. After Sova "pulled the kitchen door open, pushed the screen door, and stepped onto the porch still holding the knives," an officer sprayed him with mace. *Id.* at 901. Sova retreated to the kitchen and began harming himself again. But then he moved back toward the door, knives still in hand. When Sova "pushed the screen door open," but before he stepped "out of the kitchen doorframe," the officers shot and killed him. *Id.*

at 901–02.  A reasonable jury, we held, could find that the officers used excessive force.  *Id.* at 903.

What was true in *Sova*, what was clearly established there, governs us here.  Both cases involved a knife-wielding man who disregarded commands to drop the weapon.  Each man told officers to shoot him.  And each man moved just before being shot.  One man opened a screen door and started moving onto a porch where officers stood.  The other man took a halting step from 30 feet away after remaining stationary for 20 seconds.  When it comes to the threat of imminent and serious harm posed by these fateful movements, there are no material distinctions. If anything, *Sova* might be the harder case, because the officers were closer to the suspect and at greater risk given his prior aggressive movement onto the porch, and because Sova's movement was directly toward the officers.

*Studdard v. Shelby County* reinforces the point.  Officers investigated a hit-and-run collision and confronted a man who had cut himself with a knife.  The officers stood 34 feet away.  They yelled at the man to drop his knife.  But he did not comply.  When the man raised the knife up to his throat and moved forward in a "swaying" motion, the officers shot and killed him.  *Studdard*, 934 F.3d at 480–81.  We held that the officers were not entitled to qualified immunity as a matter of law because their actions ran afoul of *Sova*.  "Both cases," we reasoned, "involved men with knives who had" ignored commands to drop them and made similar movements toward officers just before being shot.  *Id.* at 482.  Although *Studdard* came after the shooting in this case and thus did not clearly establish the law at the time, it nonetheless "did not represent a change in the law."  *Wood v. Eubanks*, 25 F.4th 414, 427 (6th Cir. 2022).  It merely explained what *Sova* clearly established.

Russ resists this conclusion.  He argues that we should not entertain the estate's argument concerning the sideways direction of Groom's fateful step because the estate raised it for the first time on appeal.  But the estate argued all along that "[t]he video speaks for itself," R.69 at 27, and that Groom's "minimal" movement did not create an imminent threat, R.68 at 13.  It has not abandoned its position, mainly premised on the video, that Groom took a halting step perpendicular to Russ, not toward him.

The video is equivocal on this point.  But a reasonable viewer could think Groom stepped sideways.  The autopsy report in fact offers some support for that view.  It shows an entrance wound on the left side of Groom's chest and a bullet trajectory to his right side.  Had Groom stepped directly toward Russ, one might expect a front-to-back trajectory.  Direction aside, the video also offers support for the estate's view of the step as a tentative, not an aggressive, one.  When facts shown in a video "can be interpreted in multiple ways," those facts "should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).  In that light, Groom's step did not foreshadow a threat of serious harm to anyone nearby.  Russ's expert acknowledged that, if Groom did not "advance[]" on Russ, "waiting on additional units would have been appropriate."  R.56-12 at 4.

Russ also tries to distinguish *Sova*.  He argues that Thomas Sova did not make any movements toward the officers.  But that is not true.  He walked through his kitchen door onto the porch wielding two knives, causing an officer on the porch to mace him.  *Sova*, 142 F.3d at 901.  After retreating, he tried again.  As he pushed the screen door to the porch open, officers shot him.  *Id.*  "If anything, the man's action of pushing the screen door open in *Sova* seems like a more purposeful move toward the officers" than Groom's step.  *See Studdard*, 934 F.3d at 482–83.

Russ adds that Groom unsheathed his knife in response to Russ identifying himself, whereas the suspect in *Sova* harmed himself before officers arrived.  That does not change things.  What matters is the threat the suspect poses in the moments just before an officer uses force.  *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).  At that point, Thomas Sova posed a more immediate risk than Groom because Sova was closer to the officers and had already made one uninvited foray onto the porch while holding his knives.  Groom, by contrast, had lowered his knife, stood 30 feet away, and cannot even be said at this stage to have stepped directly toward Russ.  How can we grant qualified immunity here when we denied it to the officers in *Sova*?  Russ has no good answer.

The district court reasoned that *Reich v. City of Elizabethtown*, decided after the shooting in this case, muddies the water.  945 F.3d 968 (6th Cir. 2019).  "Reading *Sova* and *Studdard*," we noted, "would not impress upon every reasonable officer the clear understanding that it is illegal

to shoot someone behaving like [the suspect] if that person is twenty-five feet away from one officer and thirty-six feet away from another." *Id.* at 982. *Reich* involved a "knife-wielding belligerent" with severe schizophrenia who was not taking his medication, apparently prompting him to think "everybody [was] out to get him" and apparently prompting him to ignore officers' "demands that he drop the knife." *Id.* at 979, 982. Just before being shot, the suspect "walked at a fast pace toward the officers," had his knife hand raised in a "stabbing position," and said "you're gonna have to kill me mother****er." *Id.* at 979. The law did not clearly establish that the officers' use of force lacked justification, we held, even granting the plaintiff's theory that the suspect took a step away just before the shooting. *Id.* at 979–82. That was in part because the suspect posed a threat not just to the officers, but also to "neighborhood residents," as the encounter occurred in a front yard and the officers had seen the man "pacing back and forth between houses in the neighborhood" and "acting bizarre." *Id.* at 974, 979, 981.

Groom's conduct differed materially. He stopped moving toward Russ for 20 seconds and lowered his knife to waist height. And Groom's step from 30 feet away did not suggest that he posed an immediate threat to anyone in the area. That makes this a meaningfully different case from *Reich*. *Sova*, by contrast, constitutes "[p]recedent involving similar facts" sufficient to move this case "beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quotation omitted).

We reverse and remand.