RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ASHLY ROMERO, as personal representative for the estate of Stephen Romero, deceased,

        *Plaintiff-Appellant*,

    *v.*

CITY OF LANSING, MICHIGAN, a Michigan Municipal Corporation; DONOVAN MOORE and JEFF KURTZ, Officers, individually,

        *Defendants-Appellees*.

No. 24-1865

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-01322—Hala Y. Jarbou, District Judge.

Argued: July 30, 2025

Decided and Filed: November 18, 2025

Before: MOORE, GRIFFIN, and RITZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Robert G. Kamenec, FIEGER LAW, Southfield, Michigan, for Appellant. Michael T. Berger, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Robert G. Kamenec, FIEGER LAW, Southfield, Michigan, for Appellant. Michael T. Berger, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees.

    RITZ, J., delivered the opinion of the court in which MOORE, J., concurred. GRIFFIN, J. (pp. 16–28), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

RITZ, Circuit Judge.  Two Lansing, Michigan police officers fatally shot Stephen Romero while responding to a domestic disturbance call.  Stephen's wife, Ashly Romero, now appeals the district court's dismissal of her lawsuit against the officers and the city.  We reverse as to Ashly's excessive-force claim and affirm as to the remaining claims.

I.

At the motion-to-dismiss stage, we credit all well-pleaded factual allegations in Ashly's complaint and draw all reasonable inferences in her favor.  *See Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019).

A.

On December 21, 2023, Ashly Romero called 911 to report a domestic disturbance in her driveway involving her husband Stephen Romero.  Lansing police officers Donovan Moore and Jeff Kurtz responded to the dispatch.  Although Ashly told the dispatcher that her husband was not armed and she had not been threatened with a weapon, a second caller claimed that a shooting occurred.  A third caller clarified that no one was shot, but it is unclear whether the officers received this information.

Upon arrival, Officers Moore and Kurtz drew their weapons and approached the scene, where Stephen stood outside the open driver-side door of a car, with Ashly in the driver's seat.  Officer Moore commanded Stephen to show his hands and get on the ground.  Stephen, who was holding two cell phones, placed his hands in the air then slowly placed the phones on the ground.  As he did so, he said to the officers, "bro! bro!"

The officers commanded Stephen to the ground again, at which point he got on his knees and placed his hands in the air.  Ashly remained in the driver's seat a few feet away.  The officers commanded Stephen to get "face down."  Stephen then slowly lowered his left hand across his body; said to the officers, "listen"; and raised his shirt to show the officers a holstered

gun in his waistband, on his right hip.  He then reached for the gun with his right hand, while raising his left hand in the air.  Officers Moore and Kurtz opened fire on Stephen.

Stephen yelled in pain while falling face down to the ground, and the officers stopped shooting.  Stephen, while lying on his stomach and elbows several feet away from the officers, then said—with his voice breaking—"I got you . . . I got you," and again reached his right hand toward his waist.  The officers resumed firing at Stephen, who was able to slide the gun several feet away from his body during this second round of shots.

Stephen died in his driveway.  The encounter between the officers and Stephen, which lasted less than 40 seconds, was captured on the officers' body-worn cameras.

B.

Ashly brought this suit on behalf of her husband under 42 U.S.C. § 1983.  Her suit contained three claims: (1) that Officers Moore and Kurtz violated Stephen's Fourth Amendment rights by using excessive force (Count One of the complaint), (2) that each officer failed to intervene in the constitutional violations of the other (Count Two of the complaint), and (3) that the City of Lansing failed to properly train the officers on the use of deadly force under *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978) (Count Three of the complaint).

Defendants moved to dismiss, arguing that the officers were entitled to qualified immunity.  The district court granted the motion, holding that the officers' use of deadly force did not violate Stephen's clearly established constitutional rights. The court also dismissed Ashly's failure-to-intervene and municipal liability claims.

Ashly appealed.  We have jurisdiction under 28 U.S.C. § 1291.

II.

A.

State officials are entitled to qualified immunity from a § 1983 suit unless a plaintiff can show (1) that an official violated a statutory or constitutional right, and (2) that right was clearly established when the events took place.  *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th

Cir. 2019).   We review de novo the dismissal of a claim on qualified immunity grounds. *Mitchell v. City of Benton Harbor*, 137 F.4th 420, 429-30 (6th Cir. 2025).   The key question is whether, taking the plaintiff's well-pled factual allegations as true and drawing all inferences in her favor, the plaintiff has plausibly alleged facts that allow her to succeed on the merits.  *In re Flint Water Cases*, 960 F.3d 303, 322 (6th Cir. 2020).

Our circuit disfavors granting qualified immunity at the motion-to-dismiss stage.  *See Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015).  Without any "factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent."  *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2015) (Sutton, J., concurring) (citation modified). Defendants therefore face an uphill battle.  *See id.*  "[S]o long as the plaintiff states a plausible claim for relief," the case may proceed to discovery.  *Marvaso v. Sanchez*, 971 F.3d 599, 605-06 (6th Cir. 2020).

## B.

Before addressing the merits, we must also delineate the scope of the record.  Generally, at the motion-to-dismiss stage, we are limited to the pleadings, attachments to the pleadings, documents that are referred to in the complaint and central to the plaintiff's claim, and matters of public record.  *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024).  Accordingly, our "use of [bodycam] videos is limited at this stage."  *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022).  Even if available video evidence would make litigation more efficient, "we may not consider it at the motion-to-dismiss stage if it does not blatantly contradict or utterly undermine the complaint."  *Hodges v. City of Grand Rapids*, 139 F.4th 495, 510 (6th Cir. 2025). In cases of blatant contradiction, the videos render the complaint "implausible," but "[o]therwise, we must accept the plaintiff's version as true."  *Bell*, 37 F.4th at 364.  The fact that videos will likely be dispositive evidence at summary judgment or trial does not mean we have the authority to conduct a detailed analysis now.  *Saalim*, 97 F.4th at 1002 n.4.

Here, Ashly relied on facts from the bodycam footage in her complaint and response to the motion to dismiss, as did the district court in its order dismissing her claims.  On appeal, the

parties reference the videos extensively in their briefs, and they agreed at oral argument that we can consider the videos.  We therefore reference the videos in describing the facts, drawing all necessary inferences in Ashly's favor.  *See Lee v. Russ*, 33 F.4th 860, 865 (6th Cir. 2022) (explaining that "when facts shown in a video can be interpreted in multiple ways, those facts should be viewed in the light most favorable to the non-moving party") (citation modified).

That being said, we do not believe that "uncontroverted video evidence easily resolves [this] case." *Bell*, 37 F.4th at 364.  Therefore, we limit our review of the bodycam footage to that necessary to determine whether Ashly's factual allegations are clearly false.  Because the video footage in this case is inconclusive at the relevant instances, we are ultimately required to credit the facts as they are alleged in the pleadings.  *Id.* at 366; *Hodges*, 139 F.4th at 507.

III.

We now move to the merits of Ashly's first claim, which alleges that the officers used excessive force.  We hold that Ashly has successfully pled that Officers Moore and Kurtz violated Stephen's clearly established rights when they fired a second, deadly round of shots at him while he lay on the ground.

A.

1.

To rebut the officers' qualified immunity defense, Ashly must first show that the officers violated her husband's constitutional rights.  An officer's use of excessive force violates the Fourth Amendment's protection against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  To determine whether a use of force was excessive, we ask whether the force was justified from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015)).  An officer's subjective intent is irrelevant.  *Hart v. Michigan*, 138 F.4th 409, 417 (6th Cir. 2025).

Deadly force is objectively reasonable only "when there is probable cause to believe that the suspect poses an immediate threat to the officer or to others."  *Raimey v. City of Niles*,

77 F.4th 441, 448 (6th Cir. 2023); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (same). In evaluating probable cause, we look to the facts of each individual case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Raimey*, 77 F.4th at 449 (quoting *Graham*, 490 U.S. at 396). Ultimately, in cases involving deadly force, "the question of whether a suspect posed an immediate danger is dispositive." *Id.*

To evaluate whether a use of force was reasonable, the Supreme Court has long instructed us to look at the "totality of the circumstances." *Garner*, 471 U.S. at 8-9 (1985). Until recently, our circuit would break incidents involving the use of force into "segments," and "judge each on its own terms to see if the officer was reasonable at each stage." *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)). We would then "consider the officer's reasonableness under the circumstances he faced at the time he decided to use force" for each individual segment. *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017). By design, this segmented approach "instruct[ed] us to disregard" events in the hours and minutes leading up to a deadly shooting, and instead "focus on the 'split-second judgments' made immediately before" the use of force. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (quoting *Dickerson*, 101 F.3d at 1162).

However, to the extent that the segmented approach strictly limited the window of time we consider before a particular use of force, it has been abrogated. The Supreme Court recently struck down the Fifth Circuit's "moment-of-threat" rule, which limited the reasonableness analysis to the seconds before a fatal shooting. *Barnes v. Felix*, 605 U.S. 73, 78-79 (2025). We subsequently held that *Barnes* abrogated the segmented approach to the extent that it required events to be "hermetically sealed" from the context in which they arose. *Hodges*, 139 F.4th at 517 (quoting *Barnes*, 605 U.S. at 80). Thus, following *Barnes*, we now consider "all of the events preceding" a use of deadly force when conducting the totality-of-the-circumstances inquiry. *Id.* at 518. Put another way, "[w]e do not evaluate a particular use of force by considering just one tile in the reasonableness mosaic." *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 609 (6th Cir. 2025).

So, even if we divide an incident into distinct segments, we may consider all prior events, including Fourth Amendment violations, in determining whether a particular use of force was reasonable. *Hodges*, 139 F.4th at 518. One implication of this approach is that "we look comprehensively" at video evidence depicting a use of force, "rather than narrowly considering" a particular moment represented by a screenshot. *See Feagin*, 155 F.4th at 609. Another implication is that the reasonableness of an officer's use of deadly force may decline as a situation progresses.

2.

Ashly points to three alleged instances of excessive force to support the Fourth Amendment claim brought in Count One of her complaint. She argues that the officers used excessive force by: (1) recklessly approaching the scene with their weapons drawn; (2) firing on Stephen initially; and (3) firing a second time after he was wounded. The district court, deciding this case before the Supreme Court issued *Barnes*, used this framework to segment the analysis and addressed each alleged use of excessive force individually. To reiterate, after *Barnes*, while we may divide the incident into segments, in analyzing each segment we may consider the entire sequence, including prior uses of force.

The district court found the officers were justified in drawing their guns during their initial approach on the scene, because based on the information they learned from dispatch, they had reason to believe there was a dangerous weapon involved in a domestic dispute. *See Romero v. City of Lansing*, No. 1:23-cv-1322, 2024 WL 4223961, at *5-6 (W.D. Mich. Sept. 18, 2024). The facts as pled by Ashly do not tend to undermine that conclusion. The first shooting presents a more difficult question. On one hand, Stephen largely complied with officer commands. On the other hand, as he reached for his holstered gun while facing the officers on his knees, there was a potential danger to both the officers and his wife, who sat only a few feet away within his sightline.

But we need not dwell on the first two stages of the encounter because the facts of the second shooting are well-pled enough that the excessive-force claim brought in Ashly's complaint survives a motion to dismiss. The circumstances of the second shooting were

materially different from the first, and our precedent requires that we allow Ashly's claim to proceed to discovery.

First, a brief review of the facts. After Officers Moore and Kurtz initially fired on Stephen, he fell face down to his elbows, yelling in pain. Lying on his stomach, he said: "I got you . . . I got you." He again reached toward his waist. Officers Moore and Kurtz opened fire again. As he was being shot, Stephen managed to grasp his gun and slide it away from his body, out of his reach.

The district court reasoned that the circumstances surrounding the second shooting were "mostly the same" as the first. *Romero*, 2024 WL 4223961, at *9. We disagree. When Officers Moore and Kurtz opened fire the second time, Stephen was already wounded and, by that point, lay on the ground, on his stomach and elbows. He was no longer a threat to Ashly, who was outside his reach or line of sight, and any effort to draw and point his gun at the officers would have required significant contortion of his body.

The surrounding circumstances compound these significant differences. The complaint alleges—and the video does not contradict—that prior to and after being shot the first time, Stephen was largely compliant and gave no clear indication that he intended to resist. The officers ordered him to the ground, then face down; he got to his knees, moved slowly, and made gestures of surrender. By the time he lay on the ground after a first round of fire that had clearly injured him, a reasonable officer would not have perceived Stephen as a threat.

Moreover, between the two rounds of fire, Stephen did his best to tell the officers he meant them no harm. While he lay on the ground, he said: "I got you . . . I got you!" Ashly alleges that her husband was telling officers that he was complying. Even if we believed these words to be inconclusive, we are required to accept Ashly's characterization at this stage. *See Bell*, 37 F.4th at 364.

In any event, we find it hard to imagine how Stephen's words could be reasonably interpreted as a threat. At this stage, nuanced interpretation of Stephen's words is not appropriate, but it is worth noting that the most natural characterization of "I got you" is to indicate compliance. For example, "yes, I got you" often means "I understand." *See, e.g.*,

*Gotcha*, Oxford English Dictionary, www.oed.com/dictionary/gotcha_int (defining the interjection form of gotcha as "(I have) got you . . . usually with omission of 'have'" and noting that the phrase is "used . . . to indicate understanding."). However, even accepting that a reasonable officer might not understand the meaning of "I got you," there were numerous other contextual clues that would have led an officer to understand the words were nonthreatening. For example, Stephen, who had just audibly reacted to being shot, did not shout the words in an aggressive manner. In fact, as he spoke, his voice broke. He was lying on the ground and did not move toward the officers or position himself in an offensive or provocative way. Through the entire encounter he made no sudden or aggressive gestures. On the contrary, the officers had seen Stephen put his hands in the air, place his cell phones on the ground, and move deliberately to his knees. Faced with many indicators that Stephen was trying to comply with their demands, a reasonable officer would not have interpreted Stephen's words as a sign of danger.

In these circumstances, and under our precedent, Ashly has successfully pled an excessive-force claim. The cases in which an officer may use deadly force in response to a suspect holding a gun are highly fact-bound. We must treat the presence of the gun, and even the fact that the gun may have been "in [Stephen's] hand" as "just one consideration in assessing the totality of the circumstances." *Thomas*, 854 F.3d at 366. To be clear: an officer does not need to wait until a suspect points their weapon before firing. *Id.* But officers also may not fire simply because a suspect "has a weapon, even a gun, in hand." *Chrestman ex rel. Wooden v. Metro. Gov't of Nash. & Davidson Cnty.*, -- F.4th --, No. 24-6018, 2025 WL 2650582, at *6 (6th Cir. Sept. 16, 2025). There must be "additional indicia that the safety of the officer or others is at risk." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 480 (6th Cir. 2022).

In fact, "[o]ur caselaw is replete with instances" where we have denied qualified immunity to officers who used force against someone possessing a weapon, because "the facts suggest—at least taking them in the light most favorable to the plaintiff—that the suspect did not pose a serious threat to the officer[s]." *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019). Consider *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), in which an elderly man with poor eyesight and hearing pointed a gun at two officers attempting to arrest his son. *Id.* at 748. After the man refused to drop his gun, one officer fatally shot him. *Id.* On a motion for summary

judgment, a posture far less favorable to plaintiffs than the motion-to-dismiss context, we denied qualified immunity to the officer who fired the shots. *Id.* at 754. In doing so, we credited testimony from the decedent's son that the man began lowering his gun as he was shot. *Id.* at 752. Because the shooting occurred "while the [man] was complying with the officer's command," a rights violation occurred. *Id.*

We reached a similar conclusion in *Lee*. There, a man robbed a pharmacy at knifepoint, then brandished his knife at police when he was stopped. 33 F.4th at 862. The man was "belligerent" and waved his knife while shouting at the police from a distance of about 30 feet. *Id.* at 862-63. Though he "calmed down" and lowered his knife, when he took one more step, an officer fatally shot him. *Id.* at 863-64.[1] We denied qualified immunity at the summary judgment stage, despite the fact that the officer "knew that [the decedent] had robbed a pharmacy" and "that [the decedent] had unsheathed a knife when the officers confronted him and disregarded commands to drop it." *Id.*

The facts here parallel those of *Bletz* and *Lee*. First, in both cases we denied qualified immunity because a potentially dangerous situation was de-escalating when the officers used force. In *Bletz*, the decedent lowered his rifle. 641 F.3d at 748. In *Lee*, the decedent was physically distant from the officers and had an increasingly calm demeanor. 33 F.4th at 863-64. Similarly, when officers fired a second round at Stephen, he was already on the ground. By then, at the very least, the situation had become significantly less dangerous, especially because the wounded Stephen no longer posed a threat to Ashly and had given no explicit indication at any point during the encounter that he intended harm to the officers. After having already been shot, without any signal that Stephen intended harm, the sole fact that he again reached for his gun was not enough to justify firing again.

Further, in both *Bletz* and *Lee* we denied qualified immunity because decedents were compliant enough to allay a fear of immediate harm when they were shot. As a matter of fact, in both cases, the decedents seemed to be largely *uncompliant*. *See Bletz*, 641 F.3d at 748 ("[The

---

[1]Note that the parties disputed whether the decedent had stepped forward (toward the officers) or sideways. The video evidence was "equivocal," so we construed the video in the light most favorable to the plaintiff. *Lee*, 33 F.4th at 864-65.

decedent] did not promptly comply with [the officer's] instructions to drop his weapon."); *Lee*, 33 F.4th at 863 (describing testimony that the decedent was "belligerent"). In *Bletz*, the outcome hinged on the final moment in which the victim appeared to obey an officer command to lower his weapon in the seconds before he was shot. 641 F.3d at 752. The same was true in *Lee*, where the decedent ignored commands to drop his knife, but stopped waving it. 33 F.4th at 863.

So too here. Stephen was largely compliant with officer instructions. True, Stephen did not get "face down" when told to, instead remaining on his knees. But *Bletz* and *Lee* show that we do not require perfect compliance. And unlike both of those cases, Stephen did not disobey any commands explicitly related to his weapon, which he voluntarily showed to the officers. Additionally, by the time officers fired a second round, Stephen was on the ground in full compliance with their commands. Any orders Stephen ignored are far less indicative of a threat than those ignored by the decedents in *Bletz* and *Lee*. Under our case law, that means the use of deadly force was not justified.

Our cases granting qualified immunity do not sway us in a different direction. Where we have granted qualified immunity in suits alleging deadly force, the officers faced more immediately dangerous circumstances than those present here. For example, we have frequently granted qualified immunity when an officer used deadly force to stop an armed individual who was advancing quickly from a short distance or behaving aggressively. *See e.g.*, *Thomas*, 854 F.3d at 362-63 (granting qualified immunity when an officer fatally shot a man, who the officer reasonably believed was a burglar, running toward him down a narrow hallway holding a gun); *Chappell v. City of Cleveland*, 585 F.3d 901, 905, 916 (6th Cir. 2009) (granting qualified immunity when a fifteen-year-old suspected of armed robbery "lunged" towards officers in a small bedroom, while ignoring commands to drop his knife); *Thornton v. City of Columbus*, 727 F. App'x 829, 831-32 (6th Cir. 2018) (granting qualified immunity to officers who shot a man who threatened passerby with a shotgun, then ignored officer commands to drop his weapon while walking towards officers from short distance). Of course, when an armed individual advances on officers or acts erratically and offensively, deadly force can be justified even when a suspect does not point a gun.

But here, Stephen did not make any overtly hostile actions and never gave any indication that he would advance toward the officers.  He heeded officers' commands to raise his hands and get on the ground.  After the officers shot him the first time, he dropped to his stomach, wounded.  Our dissenting colleague believes that the video then depicts Stephen removing his weapon from his waistband before the officers fired their second round of shots.  We interpret the video differently, and so, plausibly, could a trier of fact.  Indeed, as Ashly alleges in her complaint, Stephen's actions could reasonably be seen as an attempt to surrender the firearm.  But even if the video is ambiguous as to the precise sequence of events or what Stephen intended, it does not blatantly contradict Ashly's allegation that Stephen was incapacitated when the officers fired a second round of shots, so we must credit that allegation.  The fact that Stephen had already been wounded prior to the second shooting and showed no obvious resistance throughout the encounter distinguishes this case from those where we granted qualified immunity.

In short, *Bletz* and *Lee* govern the outcome here.  Without more, Stephen's reaching towards his firearm was not enough to justify the continued shooting of a wounded man who was lying on his stomach and had been otherwise compliant.  By the time Officers Moore and Kurtz fired a second round of shots, a reasonable officer would not have felt that Stephen presented an immediate threat.  Therefore, Ashly has plausibly alleged that officers violated Stephen's Fourth Amendment rights.**[2]**

## B.

Moreover, Stephen's rights to not be shot while (1) not posing a threat, (2) complying with officer instructions, and (3) being otherwise incapacitated were all clearly established at the time these events took place.  Our case law provides abundant notice that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."  *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (internal quotation marks omitted); *see also*

---

**[2]**Because we believe that Ashly has plausibly alleged a rights violation by the time of the second shooting, her excessive-force claim can proceed, and it is unnecessary for us to decide whether the officers violated Stephen's rights at an earlier point.  *See Baker v. City of Hamilton*, 471 F.3d 601, 608-09 (6th Cir. 2006) (denying summary judgment on an excessive-force claim because the officer struck a suspect with a baton, when the single excessive-force claim also alleged tackling, choking and other injuries.).

*Dickerson*, 101 F.3d at 1163 (same). Further, the "right to be free from deadly police force while complying with police commands to disarm [is] clearly established." *Bletz*, 641 F.3d at 754. And by 2023, it was clearly established that even if a suspect is "armed and . . . disobeyed the officers' commands, these facts do not alone amount to a threat of serious or deadly harm." *Heeter v. Bowers*, 99 F.4th 900, 915 (6th Cir. 2024)*; see also Leftwich v. Driscoll*, Nos. 22-1572/1575, 2023 WL 3563207, at \*4, (6th Cir. May 19, 2023) ("[W]e have repeatedly held that when a suspect possesses a weapon but does not have it pointed at anyone, qualified immunity is generally inappropriate."). Lastly, "we have repeatedly held that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker*, 471 F.3d at 607.

Our dissenting colleague agrees that these propositions were clearly established at the time the defendants shot and killed Stephen but maintains that Stephen remained a threat to the officers even after they shot him the first time. As described above, though, we draw all reasonable inferences and interpret the video in Ashly's favor, and she has plausibly alleged that Stephen was neutralized and complying with the officers' commands. Under these well-pleaded facts and our case law, Officers Moore and Kurtz were on notice that Stephen had a right not to be lethally shot. To be sure, the Supreme Court has cautioned that "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). But for that reason, and because the video in this case is inconclusive, it makes sense to conduct discovery here. Without the benefit of the full record, it is difficult to make definitive conclusions about factual parallels. *See Chrestman*, -- F.4th --, 2025 WL 2650582, at \*7; *Evans-Marshall*, 428 F.3d at 235 (Sutton, J., concurring).

We hold that Ashly has adequately pled that at least by the time of firing a second round of shots, Officers Moore and Kurtz violated Stephen's clearly established rights. We reverse the district court's dismissal of the excessive-force claim.

IV.

Ashly brings two other claims: (1) failure of each officer to intervene in the constitutional violations of the other; and (2) a municipal liability claim against the City of Lansing.  We affirm the district court's dismissal of these claims.

A.

Ashly argues that each officer should have intervened in the other's use of excessive force.  To succeed on this claim, a plaintiff must show that the officer (1) "observed or had reason to know that excessive force would be or was being used," and (2) "had both the opportunity and the means to prevent the harm from occurring."  *Bard v. Brown County*, 970 F.3d 738, 752-53 (6th Cir. 2020) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

Ashly cannot make this showing.  Although the officers observed each other's use of excessive force, they did not have the opportunity to prevent it.  To succeed on the second prong, Ashly must show that "the primary wrongdoer used the force for a 'long enough' time that the observing officer had a realistic chance to end it."  *Chaney-Snell v. Young*, 98 F.4th 699, 722 (6th Cir. 2024) (quoting *Pelton v. Perdue*, 731 F. App'x 418, 426 (6th Cir. 2018)).  The events in this case occurred in rapid succession, and the shootings took place over the course of less than ten seconds.  Generally, we have held that an officer without forewarning cannot intervene in actions that continue for less than ten seconds.  *Id.*  Thus, there was no opportunity for either officer to intervene in the other's use of excessive force.

B.

We also affirm the district court's dismissal of Ashly's *Monell* claim against the City of Lansing.  To succeed on a *Monell* claim, a plaintiff must demonstrate that the officers' illegal actions resulted from an official municipal policy or custom.  436 U.S. at 694-95.  A municipality's illegal policy or custom can by shown by: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the

existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Ashly argues that the City of Lansing failed to adequately train and supervise its officers as to the use of deadly force. To succeed, Ashly must show that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). According to Ashly, the City of Lansing was deliberately indifferent because it "fail[ed] to equip law enforcement officers with specific tools to handle recurring situations." *Id.* at 287 (citations omitted).

Ashly has not plausibly pled a successful *Monell* claim. First, this theory of liability is narrow, and occurs only when "in light of the duties assigned to specific officers . . . the need for more or different training is . . . obvious." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Ashly does not provide any concrete allegations about the city's behavior, only speculation that Officers Moore and Kurtz would have behaved differently had they been properly trained. Even at the motion-to-dismiss stage, Ashly must plead specific facts beyond speculation and bare recitation of the standard for municipal liability. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). We agree with the district court that, without more concrete allegations, this claim cannot proceed to discovery.

V.

For these reasons, we affirm the district court as to Ashly's failure to intervene and *Monell* claims. As to the excessive-force claim, we reverse.

---

**CONCURRENCE / DISSENT**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

Today's decision endangers the lives of all law enforcement officers in the Sixth Circuit. It egregiously misapplies the law of self-defense and qualified immunity to the extent that few, if any, police officers would voluntarily assume such a high level of personal risk and potential financial liability.

Because Officers Moore and Kurtz are entitled to qualified immunity, I would affirm the district court's dismissal of plaintiff's excessive-force claim. I therefore respectfully dissent. I concur, however, with affirming the district court's dismissal of plaintiff's other claims.

I.

At the motion-to-dismiss stage, we generally "construe the complaint in the light most favorable to plaintiffs, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in plaintiffs' favor." *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019). That said, when video evidence, such as body-cam footage, "blatantly contradicts or utterly discredits the plaintiff's version of events," we may rely on this evidence instead. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (citation modified) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The complaint alleges that "Mr. Romero submitted by getting on his knees," "communicated his intent to surrender the firearm and lay it to the ground," and never "remove[d] a firearm from his waistband." The officers' body-cam footage blatantly contradicts these allegations, however, and therefore I will rely on the video evidence, which shows the following.

As Officers Moore and Kurtz responded to a domestic disturbance, dispatch informed them of a confirmed shooting of a woman. At the scene, Romero stood outside a vehicle with the driver-side door open and a woman inside. With his service weapon drawn, Officer Moore yelled, "Hey! Show your hands, show me your hands!" Romero turned towards the officers with his hands open. Officer Moore then commanded, "Get on the ground, get on the ground, now!" Romero showed two cellphones, one in each hand. Officer Moore again commanded, "Get on the ground or I will shoot you!" Romero slowly placed the cellphones on the ground, remained standing, and eventually kneeled down. Officer Kurtz ordered Romero to get "face down." Instead, Romero lifted his shirt to reveal a gun at his waist. Romero then moved his right hand down and grabbed the gun.



Officer Moore fired his service weapon. After being struck, Romero fell on the ground and said "I got you" twice. Romero then reached for his gun, again.



Officer Moore yelled, "Stop!" Romero removed the gun from his waistband.



The officers fired their weapons several more times, and the gun slid down the driveway towards them while Romero lay motionless, fatally wounded.

In sum, the video evidence clearly establishes that Romero failed to comply with the officers' commands, reached for and grabbed his firearm twice, removed it from his waistband, and the officers used deadly force in response.

## II.

Law enforcement officers are entitled to qualified immunity unless a plaintiff plausibly alleges that they "(1) violated a constitutional right (2) that was clearly established at the time of the wrongdoing." *Bell*, 37 F.4th at 367 (citation modified). Here, plaintiff fails to show either and, thus, Officers Moore and Kurtz are entitled to immunity from suit.

## A.

An officer's use of force violates the Fourth Amendment "when it is not 'objectively reasonable'" under the "totality of the circumstances." *Barnes v. Felix*, 605 U.S. 73, 76 (2025) (citation omitted). The totality of the circumstances accounts for "the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). And we judge the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396). "The bottom-line inquiry is whether the totality of the circumstances justifies a particular level of force." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (citation modified).

When an incident involves several uses of force, we "segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Id.* (citation modified). Here, plaintiff alleges three uses of excessive force by the officers: (1) approaching Romero with weapons drawn when arriving on the scene; (2) shooting Romero after he grabbed a gun at his waist; and (3) shooting Romero when he removed the gun from his waistband.

The parties employed the segmented approach in briefing, as did the district court. The majority chooses to discuss only the last use of force, while also suggesting that *Barnes* precludes us from taking the segmented approach. At issue in *Barnes* was the Fifth Circuit's

"moment of threat" rule.  Under that rule, a court reviewing whether a use of deadly force was excessive "could ask only about the situation existing '*at the moment of the threat*' that sparked the fatal shooting."  605 U.S. at 78 (citation omitted).  The Court held that such a rule does not comply with the Fourth Amendment because it "constricts the proper inquiry into the 'totality of the circumstances.'"  *Id.* at 79.  Our segmented analysis, however, is simply a method to sensibly analyze "each step along the way" in cases involving "multiple" alleged unlawful uses of force.  *Wright*, 962 F.3d at 865.  And "for each purported violation . . . we must consider all the 'relevant circumstances' 'leading up to the climactic moment.'"  *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 611 (6th Cir. 2025) (quoting *Barnes*, 605 U.S. at 76).  *Barnes* does not foreclose this approach, at least not when properly applied to avoid temporal extremes.  *Id.* at 610–11.

Like the parties and the district court, I address each in turn.

1.

Officers Moore and Kurtz responded to a domestic-violence call.  While en route, dispatch informed them that a weapon had been discharged and that a woman had been shot.  Upon arrival, they sprang from their vehicles and rushed to the scene, weapons drawn.  Plaintiff asserts that this was an unreasonable use of force because the officers did so "without a justifiable fear."  This assertion is unavailing.

An officer does not violate the Fourth Amendment by approaching with his weapon drawn when the officer reasonably fears for his safety or the safety of the public.  *Wright*, 962 F.3d at 865–66.  As the district court correctly found and the video evidence confirms, this was the case here:  Officers Moore and Kurtz "had reason to believe that a firearm had been used and that Plaintiff had been a target," which gave the officers ample "reason to approach Romero with a show of deadly force in order to dissuade him or anyone else from using a firearm again."

Further, as the district court stated, the surrounding circumstances "amplified" the officers' safety concerns:  "two individuals (whom the officers would have reasonably assumed were Plaintiff and the shooter) arguing or yelling at one another," which signaled that "the domestic dispute had not ended"; and "Plaintiff herself was not fully visible, so it would not have

been clear whether she was unharmed." As we have recently explained, "domestic abusers with firearms are dangerous not only to their direct victims, but also to accompanying loved ones, bystanders, and responding law enforcement officers." *United States v. Gailes*, 118 F.4th 822, 827 (6th Cir. 2024). Indeed, empirical evidence suggests "that domestic disputes were the most dangerous type of call for responding officers, causing more officer deaths with a firearm than any other type of call." *United States v. Rahimi*, 602 U.S. 680, 706–07 (2024) (Sotomayor, J., concurring); *Stimmel v. Sessions*, 879 F.3d 198, 210 (6th Cir. 2018) (noting that as much as 10% of non-accidental officer fatalities had occurred while officers were responding to domestic disturbances). The fact that Officers Moore and Kurtz were responding to a domestic dispute further bolsters the reasonableness of approaching Romero with weapons drawn.

Accordingly, the officers did not violate the Fourth Amendment in this instance.

2.

After encountering Romero outside the vehicle, the officers instructed him to lie face down. Romero failed to fully comply, only kneeling, and then grabbed a gun on his waist. Officer Moore opened fire, striking Romero. Plaintiff asserts that Romero had to do more—put his finger on the trigger, rack the gun, aim it, or even fire it—before Officer Moore could have used deadly force. Again, however, plaintiff's assertion is unavailing.

"To justify lethal force, an officer must have probable cause to believe the suspect presents an immediate threat of serious physical harm to the officer or others." *Studdard v. Shelby Cnty.*, 934 F.3d 478, 481 (6th Cir. 2019) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). The "objective assessment of the danger a suspect poses" must be made "from the perspective of a reasonable officer in the defendant's position." *Jacobs v. Alam*, 915 F.3d 1028, 1040–41 (6th Cir. 2019) (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)). When considering whether the use of deadly force was reasonable, we look to the totality of the circumstances that the officer faced at the time he decided to use force. *See Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017). Shooting a suspect is lawful when officers could reasonably conclude that he might fire a gun at them. *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1096 (6th Cir. 2023).

The district court aptly described—and the video evidence confirms—the circumstances surrounding the first shooting:

> When [Officer Moore] shot Romero the first time, he had not fully complied with multiple orders to "get on the ground" . . . and he was not moving toward compliance. Instead, he had lifted his shirt and put his hand on a gun that he had apparently used earlier in the evening during a dispute with his wife. He did not explain his intentions or make gestures clearly indicating that he intended to turn his weapon over to the officers. Nor did he reach for his weapon slowly and gradually, which might have given the officers an opportunity to specifically warn him not to touch his weapon. And by the time he put his hand on his gun, he could have quickly and easily turned it on his wife nearby or the officers in front of him. In fact, Plaintiff was only a few feet away to his left and would have been in a direct line of fire had he finished pulling the pistol out of his waistband with his right hand. Thus, not knowing Romero's intentions, but knowing the possibility that he might use his weapon again, [Officer Moore] had to make a split-second decision about how best to protect [the officers] and Plaintiff from the apparent threat [Romero] posed.

Further, as explained before, the officers were responding to a domestic disturbance purportedly involving a confirmed shooting. And the whole encounter, from when Officer Moore first commanded Romero to show his hands to when Romero reached for his gun, lasted only fifteen seconds.

Under these circumstances, Officer Moore had probable cause to believe that Romero posed an immediate threat of serious physical harm to the officers or others: The officers reasonably believed that a firearm had been discharged and a woman shot; they had ordered Romero to get face down on the ground and he never did; and Romero grabbed a gun on his waist, of his own accord and unexpectedly, mere feet away from the officers and plaintiff. Officer Moore was not required to wait for Romero to rack or point the gun before using deadly force. *See Jacobs*, 915 F.3d at 1040 ("[A]n officer need not face the business end of a gun to use deadly force."); *Thomas*, 854 F.3d at 365–66; *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018). Moreover, Officer Moore had only a split second to protect himself, Officer Kurtz, and plaintiff from the imminent threat Romero posed after he placed his hand on the gun, and we "do not second guess such split-second decisions." *Puskas*, 56 F.4th at 1096.

In hindsight, plaintiff hypothesizes that Romero may have reached for his weapon intending to surrender it. But this is not the standard we employ. *Thomas*, 854 F.3d at 365. We ask whether the use of deadly force was reasonable from the perspective of an objective officer confronting the circumstances Officer Moore did. *Id.* (adding that we do so "mindful that police officers face tense, uncertain, and rapidly evolving situations" (citation modified)). Under this standard and these circumstances, Officer Moore's use of deadly force was reasonable.

3.

After being shot by Officer Moore, Romero fell to the ground. He groaned in pain, said "I got you" twice, and then reached down and removed the gun from his waistband. Both officers fired, fatally striking Romero. Plaintiff argues that this shooting was excessive because Romeo was already incapacitated. Plaintiff is incorrect. Because Romero continued to threaten the safety of the officers, even while wounded, their use of deadly force was reasonable.

It is true that Romero was now on the ground—but this was not because he had finally complied with the officers' orders; he was only there because he had just been shot by Officer Moore. And even as Officer Moore yelled "Stop," Romero did not cease his movements. He reached for his gun, again, and this time removed it from his waistband. The officers had not ordered him to do this; in fact, reaching for the gun was the reason he had been shot the first time. Given these circumstances, lasting mere seconds, the officers had probable cause to believe that Romero continued to present an immediate threat of serious physical harm and, thus, their use of deadly force was reasonable. *See Gambrel v. Knox Cnty.*, 25 F.4th 391, 405–06 (6th Cir. 2022) (collecting cases) ("[W]e have found that officers had the probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong).").

The majority claims that Romero was no longer a threat because "any effort to draw and point his gun at the officers would have required significant contortion of his body." But Romero was obviously able to draw his weapon from his waistband and, again, "an officer need not face the business end of a gun to use deadly force," *Jacobs*, 915 F.3d at 1040, so this argument falls flat.

Relying on *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), and *Lee v. Russ*, 33 F.4th 860 (6th Cir. 2022), the majority also contends that shooting Romero a second time was unreasonable because the situation was deescalating. But the video evidence does not bear this out. To be sure, Romero was now lying on the ground. He continued to reach for his gun, however, and this time he brought it forth from his waistband (all the while, it must be remembered, having been ordered by the officers to stay still, not surrender his weapon). From the objective perspective of a reasonable officer—at that moment—this posed an escalated threat.

Additionally, the present case is distinguishable from lowering one's weapon, as was the case in *Bletz*, 641 F.3d at 748, and *Lee*, 33 F.4th at 863. The more on-point case is *Mullins v. Cyranek*, where the decedent "removed a previously concealed firearm without any direction from [the officer] to do so, threw the weapon over [the officer's] shoulder after being commanded to drop it, and was then shot" by the officer. 805 F.3d 760, 767 (6th Cir. 2015). Even though the decedent was no longer a threat when he was shot, we concluded that the officer "was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable." *Id.* Officer Moore's and Kurtz's decision to use deadly force was equally reasonable given the severe threat that Romero posed by continuing to reach for his gun and then removing it from his waistband.

The mere fact that Romero said "I got you" before taking the gun from his waistband does not dispel this conclusion. The majority interprets these three words to demonstrate that Romero "did his best to tell the officers he meant no harm" and, drawing from the Oxford English Dictionary, posits that "the most natural characterization of 'I got you' is to indicate compliance." But the officers had responded to a domestic disturbance purportedly involving a confirmed shooting, faced a suspect who continually reached for a firearm at his waist while being ordered to get face down and stop moving, and then saw a weapon being drawn—all in a matter of seconds. Officers Moore and Kurtz did not have the benefit of stopping time and contemplating the nuances of English vernacular. Nor is this the standard we hold them to when assessing the reasonableness of using deadly force under these circumstances. *See Thomas*, 854 F.3d at 365.

Moreover, even if everyone at the scene understood "I got you" to mean different things—which, of course, is entirely speculative—the Fourth Amendment requires officers only to act reasonably on the information they have, not to perceive a situation accurately. *Id.*; *Chappell v. City of Cleveland*, 585 F.3d 901, 916 (6th Cir. 2009). Here, the officers witnessed Romero continually reach for his firearm and then remove it from his waistband; and, based on this information, they reasonably concluded that Romero might fire a gun at them. Thus, despite Romero saying "I got you," using deadly force was objectively reasonable. *Gambrel*, 25 F.4th at 405–06.

In sum, plaintiff fails to plausibly show that the officers violated the Fourth Amendment in any of the three instances.

B.

Even assuming plaintiff succeeded under the first prong of the qualified immunity test, she fails to plausibly allege that the officers violated a constitutional right that was clearly established at the time of the alleged wrongdoing. To make this showing, a plaintiff "must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell*, 37 F.4th at 367. "[W]hen it comes to excessive force, the Court has repeatedly told us that specific cases are 'especially important.'" *Id.* (citing *City of Tahlequah v. Bond*, 595 U.S. 9, 12–13 (2021) (per curiam); *Kisela v. Hughes*, 584 U.S. 100, 104–05 (2018) (per curiam)). "The unlawfulness of the officer's acts 'must be so well defined' that no reasonable officer would doubt it." *Id.* (quoting *Bond*, 595 U.S. at 12).

But plaintiff fails to cite a case showing that all reasonable officers would have known that shooting Romero under the specific circumstances faced by Officers Moore and Kurtz was unconstitutional.[1] She does cite cases for the proposition that an individual has a right not to be

---

[1]When discussing the second prong of the qualified immunity test, plaintiff focuses solely on the officers' use of deadly force and does not cite a single case regarding whether a reasonable officer would have known that approaching this scene with weapon drawn was unconstitutional. Accordingly, I discuss only plaintiff's assertion that the officers' use of deadly force violated a constitutional right that was clearly established at the time. I also note that plaintiff has likely abandoned the issue of qualified immunity regarding the officers' first use of force. *See Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003).

shot when complying with commands, but this is not in dispute. Nor is it relevant: Romero was not complying, as the video evidence clearly shows.

*Lee* does not help either—as already mentioned, the decedent in that case was lowering his weapon when he was shot, not grabbing for it or removing it from his waistband, and he stood thirty feet away, not mere feet from the officers. 33 F.4th at 862–63. Nor does *Jacobs*, where the plaintiff reached for a pistol still in its holster, and which was never unholstered, and was shot only after falling down the stairs, away from the officers. 915 F.3d at 1033. In contrast, Romero kept reaching for an unholstered gun and actually drew it, in close proximity to both plaintiff and the officers. Moreover, neither *Lee* nor *Jacobs* involved officers responding to a domestic-violence situation involving an ongoing argument and what officers reasonably believed was a confirmed shooting—facts suggesting that the suspect had already resorted to violence and might do so again.

The cases cited by the majority fare no better. Some simply stand for the general proposition that an individual has a right not to be shot while "(1) not posing a threat, (2) complying with officer instructions, and (3) being otherwise incapacitated." But, again, the video evidence clearly demonstrates that these were hardly the circumstances here: The officers reasonably believed that Romero had discharged his firearm and shot someone moments before their arrival; Romero reached for his gun while being ordered to do the opposite (lie still, face down); and even after being wounded by Officer Moore, Romero continued to reach for the gun and then removed it from his waistband. None of this demonstrates a non-threatening, compliant, or otherwise incapacitated individual.

Other cases cited by the majority fail to give the requisite "fair and clear warning" that the particular conduct alleged here violated the law. *Kisela*, 584 U.S. at 105. For example, in *King v. Taylor*, officers shot the decedent through a window while he was at home lying on the couch, not making any threatening gestures. 694 F.3d 650, 654, 663–64 (6th Cir. 2012). Similarly, in *Dickerson v. McClellan*, officers shot the decedent through a closed door when he went to answer it. 101 F.3d 1151, 1163 (6th Cir. 1996). And the plaintiffs in *Baker v. City of Hamilton* were unarmed and indisputably compliant. 471 F.3d 601, 607–09 (6th Cir. 2006). None "squarely governs the specific facts at issue" or provides notice to Officers Moore and

Kurtz that shooting Romero was unlawful under the circumstances they encountered.  *Kisela*, 584 U.S. at 104–05 (citation modified).

More on-point is *Thomas*.  There, an officer responded to a burglary in progress.  854 F.3d at 363.  With his service weapon unholstered, he ran to the scene where he could hear a commotion.  *Id.*  He then saw two men exiting the apartment and running towards him, with the first man holding a gun.  *Id.*  When that person closed the distance to about ten feet, the officer fired two shots.  *Id.*  The person he had shot was the apartment's owner, who had disarmed the burglar and was fleeing with the gun.  *Id.*  When deciding whether the officer was entitled to qualified immunity, we considered the circumstances that the officer faced in the moment.  *Id.* at 365.  He saw a suspect with a gun running toward him and quickly closing the gap, to a range at which "a suspect could raise and fire a gun with little or no time for an officer to react."  *Id.* at 365–66.  "Given these facts, a reasonable officer would perceive a significant threat to his life," even if the suspect had never actually raised his gun and was the victim, not the burglar.  *Id.* at 366.

If it was objectively reasonable for an officer to use deadly force under those facts, then the law is not clearly established such that all reasonable officers would have known that shooting Romero was unconstitutional.  Just as in *Thomas*, at a distance of mere feet, Romero could have raised and fired his gun "with little or no time for an officer to react."  *Id.* at 366.  And here Romero could have done so not once but twice.  Given those facts, in addition to the fact that the officers were responding to a domestic disturbance purportedly involving a confirmed shooting, "a reasonable officer would perceive a significant threat to his life," which makes Officers Moore's and Kurtz's use of deadly force "objectively reasonable."  *Id.*

In sum, existing precedent does not place beyond debate whether Officers Moore and Kurtz violated a constitutional right that was clearly established at the time of the alleged wrongdoing and, thus, the officers are entitled to qualified immunity.  *Kisela*, 584 U.S. at 104.

### III.

The district court dismissed plaintiff's two other claims:  a failure-to-intervene claim and a municipal liability claim.  Regarding the first, I would affirm on the grounds provided by the

district court, not those of the majority: neither officer violated the Fourth Amendment and, thus, neither had an obligation to intervene. Accordingly, I concur in the judgment only. Regarding the second, I join the majority's analysis in full.

IV.

For the foregoing reasons, I would affirm the judgment of the district court. Accordingly, I respectfully concur in part and dissent in part.